TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

THOMAS W. PORTS, JR.
SHANNON BOYLAN
150 M Street, NE
Washington, DC 20002
Tel: (202) 305-0492
Fax: (202) 305-0506
thomas.ports.jr@usdoj.gov
shannon.boylan@usdoj.gov

Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>        Defendant. | CASE NO. 3:18-cv-00265-HRH<br><br>**UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background ................................................................................................................. 7

    I.     Legal Background ................................................................................... 7

          A.    The equal footing doctrine and implementing acts .................................... 7

          B.    Navigability for riverbed title under the equal footing doctrine ................ 8

          C.    Navigability under other tests and for other purposes ............................ 10

          D.    The summary judgment standard ............................................................ 11

    II.    Factual Background ............................................................................... 12

          A.    From its headwaters at Slate Creek and Independence Creek, the North Fork of the Fortymile River changes character several times while continually increasing in volume until it flows into the main stem of the Fortymile River, which then flows into the upper Yukon River .................................................................................................... 12

          B.    People have long settled in and traveled through the Fortymile Basin using multimodal travel. ........................................................................ 17

          C.    Despite extensive evidence recording pre-statehood use of downstream reaches in the Fortymile and Yukon River system, there is no evidence recording pre-statehood use of the North Fork above Champion Creek. .................................................................................. 18

          D.    The only demonstrated floating on the disputed reach occurred decades after statehood, downstream only, using modern inflatable rafts that often strike obstacles or must be dragged over boulders and riffles. ....................................................................................................... 21

    III.    Procedural history .................................................................................. 23

    IV.    Separate Summary of Undisputed Facts ................................................ 25

Argument ................................................................................................................. 28

    I.     Alaska cannot show that the disputed reach of the North Fork was used or is susceptible of being used, in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water at the time of statehood. ............. 28

A.    Susceptibility to downstream-only floating for recreation and government purposes is legally insufficient to make a river navigable in fact. ........................................................................ 28

B.    Mere depth of water is legally insufficient to make a river navigable in fact. ..................................................................................... 32

C.    Watercraft considered in any susceptibility analysis must have been the "modes of trade and travel on water" that were "customary" at statehood ......................................................................................... 34

1.    Any watercraft considered must have been used for "trade and travel" that, as a realistic matter, might have occurred on the river at issue .......................................................... 35

2.    Any watercraft considered must have been "customary" for the identified reasonable commercial use .................................... 39

3.    Alaska fails to focus its watercraft evidence on "the time of statehood," and its position is thus contrary to law ..................... 41

4.    Based on the undisputed facts, certain watercraft cannot meet the legal test ....................................................................... 42

a.    Inflatable rafts were used for a variety of "other purposes," but were not ucustomary modes of trade and travel on water at statehood........................................ 42

b.    Canoes were "the craft of the explorer" then became recreational craft, but they were not a customary mode of trade and travel on water at statehood ................ 44

c.    Airboats in Alaska were used for recreation..................... 46

d.    Jet boats were "new" in Alaska in the summer of 1959 and thus could not have been a customary mode of trade and travel at statehood in January 1959............... 47

e.    Outboard motor lifts were not customary means of trade and travel at statehood ............................................. 48

II.    The State's Motion for Summary Judgment Should Be Denied for Several Additional Reasons. ............................................................................ 49

A.    Even if the post-statehood floats down the disputed reach were considered uses of the river "as a highway of commerce," modern rafts are not meaningfully similar to pre-statehood rafts and the State has failed to prove these same uses could have occurred at statehood ..... 49

B.    Even if "mere depth" were sufficient to prove a river is navigable under the equal footing doctrine, there is a dispute about the available channel depth and the drafts of watercraft ............................... 53

C.    The fact that other rivers in Alaska or other segments of this river have been considered navigable by federal employees, adjudicated navigable by the Interior Board of Land Appeals, or disclaimed, does not change the law or make this river segment navigable ............... 58

Conclusion ........................................................................................................................... 59

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Ahtna,*
891 F.2d 1401 (9th Cir. 1989) ............................................................. 3, 30, 31, 32

*Alaska v. United States,*
201 F.3d 1154 (9th Cir. 2000) ............................................................. 8, 37

*Alaska v. United States,*
563 F. Supp. 1223 (D. Alaska 1983) .................................................. 10

*Am. Dredging Co. of Nev. v. Mintzer,*
245 F. 297 (9th Cir. 1917) ............................................... 2, 29, 30, 32, 33, 36

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................ 12

*Bonelli Cattle Co. v. Arizona,*
414 U.S. 313 (1973) ............................................................................ 8

*Boone v. United States,*
944 F.2d 1489 (9th Cir. 1991) ........................................................... 10

*California ex rel. State Land Comm'n v. United States,*
457 U.S. 273 (1982) ............................................................................ 7

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................ 12

*Gasquet v. Com. Union Ins. Co.,*
391 So. 2d 466 (La. Ct. App. 1980) ................................................... 47

*Hardy v. State Land Board,*
360 P.3d 647 (Or. Ct. App. 2015) ...................................................... 38

*Harrison v. Fite,*
148 F. 781 (8th Cir. 1906) .................................................................. 33

*Harrison v. State,*
No. A-13276, 2022 WL 1769132 ....................................................... 11

*In re Oracle Corp. Sec. Litig.,*
627 F.3d 376 (9th Cir. 2010) ............................................................. 12

*Kaiser Aetna v. United States,*
444 U.S. 164 (1979) ............................................................................ 10

*Lee v. United States,*
629 F. Supp. 721 (D. Alaska 1985) .................................................... 25, 26

*Matsushita Elec. Indus. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ............................................................................ 11, 12

State of Alaska v. United States of America
Case No. 3:18-cv-00265-HRH                          iv

*Munoz v. Albuquerque A.R.T. Co.*,
  829 F. Supp. 309 (D. Alaska 1993) ................................................................ 12

*N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*,
  853 F.3d 140 (4th Cir. 2017) .................................................... 33, 34, 38, 46

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ............................................................... 12

*Nw. Steelheaders Ass'n, Inc. v. Simantel*,
  112 P.3d 383 (Or. Ct. App. 2005) .................................................... 37, 40

*Oklahoma v. Texas*,
  258 U.S. 574 ............................................................................................. 35

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*,
  429 U.S. 363 (1977) ..................................................................................... 8

*Oregon v. Riverfront Protective Assn.*,
  Case No. 70-cv-40, at *6 (D. Or. 1980) .................................................... 39

*Power Co. v. Federal Power Comm'n*,
  185 F.2d  (D.C. Cir. 1950) ......................................................................... 10

*PPL Mont., LLC v. Montana*,
  565 U.S. 576 (2012) .......................................................................... *passim*

*PPL Montana, LLC v. State*,
  229 P.3d 421 (Mont. 2010) ....................................................................... 36

*Puget Sound Power & Light Co. v. FERC*,
  644 F.2d 785 (9th Cir. 1981) .................................................................... 39

*Slenk v. Transworld Sys., Inc.*,
  236 F.3d 1072 (9th Cir. 2001) .................................................................. 12

*State of North Dakota, ex rel. Bd. of Univ. & School Lands v. United States*,
  972 F.2d 235 (8th Cir. 1992) .................................................................... 30

*State of Oregon By & Through Division. of State Lands v. Riverfront Protectors Association*,
  672 F.2d 792 (9th Cir. 1982) .................................................................... 39

*State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*,
  232 P.3d 1203 (Alaska 2010) ................................................................... 11

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987) .................................................................... 11

*The Daniel Ball*,
  77 U.S. 557 (1870) ....................................................................................... 9

*Toledo Liberal Shooting Co. v. Erie Shooting Club*,
  90 F. 680 (6th Cir. 1898) ............................................................. 29, 30, 32

*United States v. Brewer-Elliot*,
   249 F. 609 (W.D. Okla. 1918) ............................................................ 36

*United States v. Ladley*,
   4 F. Supp. 580 (D. Idaho 1933) .................................................... 30, 34

*United States v. Oregon*,
   295 U.S. 1 (1935) ...................................................... 2, 29, 30, 50, 56

*United States v. Utah*,
   283 U.S. 64 (1931) .................................. 1, 8, 9, 34, 35, 37, 40, 43, 59

*United States. v. Rio Grande Dam & Irrigation Co.*,
   174 U.S. 690 (1899) ...................................................................... 33, 36

*Utah v. United States*,
   403 U.S. 9 (1971) .......................................................................... 32, 45

*W.H. Pugh Coal Co. v. United States*,
   418 F. Supp. 538 (E.D. Wis. 1976) ................................................... 25

**Statutes**

16 U.S.C. §§ 1301-1311 .............................................................................. 8

28 U.S.C. § 2409a(e) ................................................................................. 24

28 U.S.C. § 2809a ..................................................................................... 24

43 U.S.C. § 1311(a) ..................................................................................... 8

43 U.S.C. §§ 1301–1315 .............................................................................. 8

Pub. L. No. 85-508, 72 Stat. 339, 343 (1958) ............................................. 8

**Rules**

Fed. R. Civ. P. 7 ......................................................................................... 1

Fed. R. Civ. P. 56(e) ................................................................................. 11

**Regulations**

43 C.F.R. §§ 1864.1-1 ............................................................................... 24

43 C.F.R. § 1864.2 ..................................................................................... 24

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH
               vi

Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 7 of 69

**TABLE OF EXHIBITS**

A.     August 1987 BLM Field Notes from North Fork Float Trip

B.     State's expert report re: Hydrology of the Middle and North Forks of the Fortymile River (Fuller) (excerpt)

C.     United States' expert report re: Prestatehood Travel by Water on the Middle Fork and Upper North Fork of the Fortymile River, Alaska (Greenwald)

D.     United States' expert report re: Navigability of North Fork and Middle Fork Fortymile River (Mussetter) (excerpt)

E.     Deposition of Jonathan Fuller (excerpt)

F.     BLM 1983 Memorandum Navigability Determination for the Fortymile River Basin, US-MFR0004716

G.     Addendum to Greenwald Report

H.     Deposition of Robin Mills (excerpt)

I.     Declaration of Larry Bartlett

J.     Deposition of Larry Bartlett (excerpt)

K.     Deposition of Jack Frost (excerpt)

L.     Deposition of Kevan Cooper (excerpt)

M.     Jack Frost July 2018 Field Notes (excerpt)

N.     State's expert report re: Boatability on the Middle and North Forks of the Fortymile River (Whittaker & Shelby) (excerpt)

O.     July 6, 1983, Memorandum re: Navigability Documentation, Middle Fork, North Fork and Hutchinson Creek Tributaries of the Fortymile River (Tileston)

P.     Gulkana River navigability litigation stipulation re: river conditions (1984) (excerpt)

Q.     Declaration of Vanessa Thompson (excerpt)

R.     Court Opinion from *State of Oregon v. Riverfront Protection Ass'n, et al.*, Civ. No. 79-40-E (D. Or. Dec. 8, 1980)

S.     State's expert report re: History of Small River Boats in Use at Statehood (Rice) (excerpt)

T.     Deposition of Mark Rice (excerpt)

U.     United States' expert rebuttal report re: Analysis of Military Surplus Raft Circa 1959 (Marshall)

V.     Jason Marshall Curriculum Vitae

W.   State's expert report in rebuttal to Mussetter's Report (Whittaker & Shelby) (excerpt)

X.   Deposition of Douglas Whittaker (excerpt)

Y.   Deposition of Bo Shelby (excerpt)

Z.   Deposition of Jason Marshall (excerpt)

AA.  Deposition of Bob Mussetter (excerpt)

AB.  USGS Manual for Measuring Discharge with Acoustic Doppler Current Profilers from a Moving Boat (excerpt)

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    viii
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 9 of 69

Pursuant to Federal Rules of Civil Procedure 7 and 56, the United States of America moves for partial summary judgment or, in the alternative, to establish the law of the case. Navigability is a fact-intensive inquiry and "each determination as to navigability must stand on its own facts," *United States v. Utah*, 283 U.S. 64, 81 (1931), but the undisputed facts in this case implicate certain rules suited for summary judgment. The United States respectfully requests three legal rulings at this time: First, that downstream-only floating shown by the undisputed facts is not in-and-of-itself use of a river as a highway of commerce under controlling federal law. Second, that proving depth and width of water in a river is not sufficient to show the river is navigable under controlling federal law. And third, that the undisputed facts show inflatable rafts, canoes, airboats, and jet boats were not customary modes of trade and travel at statehood. To the extent disputed facts preclude this final request, the United States alternatively requests a ruling requiring that any proof of "susceptibility" to navigation at statehood be based on watercraft that were modes of (1) trade and travel (2) customary for commerce that could realistically have occurred on the disputed reach (3) at the time of statehood. The State's motion should be denied because it ignores the applicable framework and necessary elements of equal-footing navigability.

## INTRODUCTION

The uppermost extent of the Fortymile River's North Fork is not navigable under the equal footing doctrine because this rugged and rocky reach—although beautiful and enjoyed by hunters in modern inflatable rafts—lacks useful capacity as a public highway

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    1
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 10 of 69

of transportation. A waterway is navigable under the equal footing doctrine only if, in its ordinary condition at statehood, the river was either actually used or susceptible to use as a highway of commerce in the customary modes of trade and travel on water.

The need to maintain open highways for commerce is core to sovereign ownership of the submerged lands under navigable waters. To that end, the Ninth Circuit has long recognized that "[m]ere depth of water, without profitable utility, will not render a water course navigable" under the equal footing doctrine, "nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes." *N. Am. Dredging Co. of Nev. v. Mintzer*, 245 F. 297, 300 (9th Cir. 1917). To be navigable, a water course "must have a useful capacity as a public highway of transportation," *id.*, and have "general and common usefulness for purposes of trade and commerce," *United States v. Oregon*, 295 U.S. 1, 23 (1935). The Supreme Court recently reaffirmed that navigability under the equal footing doctrine "concerns the river's usefulness for ' "trade and travel," ' rather than for other purposes." *PPL Mont., LLC v. Montana*, 565 U.S. 576, 589 (2012) (*PPL*) (citation omitted).

The fact that the disputed reach has never been, is not now, and will never be a useful public highway of transportation, is proved by the only person who makes part of his living related to that segment. One hunt planner, Larry Bartlett, arranges for hunters to "float-drag" the disputed reach using modern inflatable rafts. Bartlett, a U.S. Army veteran, testified that he started identifying and floating Alaskan rivers beyond the reach of water-based highways to escape people and motors as self-treatment for trauma he experienced in combat. After being honorably discharged, Bartlett wrote two books—

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                                    2
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 11 of 69

*Float Hunting Alaska* and *Float Draggin' Alaska*—and made a business out of

identifying isolated river segments that could not reasonably be traveled in anything other

than modern inflatable rafts. The disputed reach of the North Fork is one such segment.

Bartlett first floated the disputed reach in 2005 or 2006 and started putting clients

on the reach in 2007, using a first generation of specialized rafts that he had designed,

manufactured, and rented to clients for use on other rivers. But for five years he received

many complaints and no repeat customers. Bartlett's initial clients found it so arduous to

float-drag from their put-in point until they reached the North Fork's deeper, partly

bedrock-controlled segment below Champion Creek that they could not focus on hunting

and did not return as clients. This changed only after Bartlett designed and manufactured

a second generation of inflatable rafts to carry more weight, draft less, and experience

less friction when dragged. Bartlett's experience is consistent with the only other

recorded trip on the disputed reach, other than trips taken for purposes of this litigation.

The field notes from that August 1987 trip expressed skepticism at even calling the reach

a river, writing, "[t]he 'river' isn't any bigger than a creek here."[1]

These post-statehood floats are insufficient as a matter of law to establish the

reach is navigable because the floats are not uses of the river as a highway of commerce

or transportation on water for profit. In *Alaska v. Ahtna*, the Ninth Circuit said a use

cannot be ignored simply because it "relates to the recreation industry," but it did not say

that every recreational float on a river is use of that river as a highway of commerce. 891

---

[1] August 1987 BLM Field Notes, attached as Ex. A ("Aug. 1987 Notes").

F.2d 1401, 1405 (9th Cir. 1989). It recognized that a navigable river must still have useful capacity "as a highway" for commerce, and found that a "substantial industry of transportation for profit" existed on the river at issue in that case. *Id.* Here, no person has ever used the reach to transport people or things for commerce or charged a fee to transport people or things on the reach, even related to recreation. The only transportation for profit that has ever occurred related to the disputed reach has been by air—chartering flights to get to the reach's headwaters—because the reach is not now and has never been a useful highway. The United States therefore requests a ruling that all undisputed uses that have occurred on the reach are not the kinds of uses that make a river navigable under the equal footing doctrine.

Also insufficient as a matter of law are the State's claims[2] that a clear 8-to-16 inch channel exists through the disputed reach, because depth of water alone does not demonstrate that a watercourse has profitable utility as a highway of commerce. Even if a watercourse is deeper than the draft of certain watercraft, other facts related to the watercourse, watercraft, and commerce must be assessed to determine whether the watercourse could have been a useful highway. Beyond depth, courts have considered a watercourse's velocity, obstructions, reliability, adjacent resources, and whether boats could travel it in multiple directions rather than downriver only. Indeed, contrary to the State's 8-to-16-inches-is-all-you-need position here, the State has previously stipulated that deeper water with average depths from 12-to-36 inches could *only* be floated

---

[2] The United States disputes the State's claims about depth, as explained *infra*, Part II.B.

downstream using inflatable rafts, kayaks, and small canoes. At trial, the evidence will show that the disputed reach is not navigable, but at this time the United States respectfully requests a ruling that a court cannot find a watercourse navigable based on depth of water alone.

Finally, the undisputed facts establish the State cannot seek to prove the river was susceptible to use as a highway of commerce at statehood using inflatable rafts, canoes, airboats, or jet boats because those watercraft were not "customary modes of trade and travel on water" at statehood. Where, as here, historic evidence does not show a watercourse was actually used as a highway of commerce at statehood, a plaintiff must seek to prove the reach was "susceptible" of being used as a highway of commerce at statehood. When analyzing susceptibility, courts must determine whether a watercourse could have been a highway of commerce in watercraft that were (1) used for trade and travel, (2) customary for those purposes, (3) at the time of statehood. The undisputed facts show inflatable rafts, canoes, airboats, and jet boats all fail to meet one or more of those criteria and thus cannot be considered in a susceptibility analysis. Alternatively, if the court finds a disputed material fact precludes summary judgment on one or more craft, then the United States respectfully requests a ruling that establishes the State must prove at trial all three required elements in order for any craft to be considered in a susceptibility analysis.

The State's motion for summary judgment should also be denied for the independent reasons that modern inflatable rafts are not "meaningfully similar" to statehood-era watercraft, the reach does not have the clear channel that the state claims,

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    5
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 14 of 69

and watercraft require more to effectively operate than simply water depth that exceeds their static draft. On the first reason, Supreme Court precedent requires that a party seeking to use evidence of post-statehood use on a river to show the river is navigable must, at minimum, prove the modern watercraft is meaningfully similar to relevant watercraft at statehood. The United States will present evidence from a small craft expert with the U.S. Navy that shows modern inflatable rafts are different from even the most similar statehood era watercraft in ways that are meaningful for the intended use and environment. On depth of water, the State relies on measurements from only the deepest, least obstructed parts of the river and misuses the U.S. hydrologist's data to make it appear that a clear channel exists. The U.S. hydrologist already explained that the State's interpretation is incorrect. On watercraft operating requirements, the U.S. Navy small craft expert will explain that the State's static-draft-only argument is inadequate, as will the U.S. expert hydrologist, and even fact-witness Bartlett's testimony demonstrates that the materials and design of a watercraft make a significant difference for what craft are useful on the disputed reach.

Common sense says a watercourse is not a useful highway of commerce if users must be prepared to drag even modern inflatable rafts when floating that watercourse. And for the reasons further explained below, the United States respectfully requests the Court grant its partial motion for summary judgment and deny the State's motion.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                6
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 15 of 69

## BACKGROUND

**I.     Legal Background**

**A.     The equal footing doctrine and implementing acts**

Under the equal footing doctrine, "[u]pon statehood, the State gains title within its borders to the beds of waters then navigable." *PPL*, 565 U.S. at 590. "A key justification for sovereign ownership of navigable riverbeds is that a contrary rule would allow private riverbed owners to erect improvements on the riverbeds that could interfere with the public's right to use the waters as a highway for commerce." *See id.* at 594. As explained further below, whether a river is "navigable" under the equal footing doctrine has a specific legal meaning and is determined under a specific test.

The equal footing doctrine arose out of English common law, as adapted to North American geography. Under common law, the Crown held title to the beds of waters subject to the ebb and flow of the tide. *PPL*, 565 U.S. at 589. When the original thirteen states ratified the Constitution, they succeeded to the Crown's title within their respective borders. *Id*. The tidal rule was ill-suited to North America, however, given the continent's vast number of major, non-tidal, inland rivers so the rule evolved over time such that the states held title to the beds of all navigable waters. *Id*. at 589-90. Thereafter, new states were admitted to the Union with the same rights, sovereignty, and jurisdiction as the original states—*i.e.*, they were admitted "on equal footing." *Id.* at 590-91. Accordingly, under the equal footing doctrine, title to lands beneath inland navigable waters passed to the new states as it had to the original states. *California ex rel. State Land Comm'n v. United States*, 457 U.S. 273, 285 (1982). Navigability for purposes of the equal footing

doctrine is determined at the time of statehood. *PPL*, 565 U.S. at 591; *Utah*, 283 U.S. at 75. These rights were conferred by the Constitution, not by Congress. *PPL*, 565 U.S. at 591.

In 1953, Congress passed the Submerged Lands Act, 16 U.S.C. §§ 1301-1311, which confirmed these rights. *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 318 (1973), *overruled on other grounds by Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977). That Act recognizes and confirms states' "title to and ownership of the lands beneath navigable waters," and "the natural resources within such lands and waters." 43 U.S.C. § 1311(a). The Alaska Statehood Act applied the Submerged Lands Act to the State of Alaska. Pub. L. No. 85-508, § 6(m), 72 Stat. 339, 343 (1958). Alaska became a state on January 3, 1959, and would thus only acquire title to submerged lands underlying waters that were navigable as of that date. *Alaska v. United States*, 201 F.3d 1154, 1156 (9th Cir. 2000).

If a river was not navigable at statehood, then title to the submerged lands follows State property law, which, in the case here, would mean those submerged lands remain federal lands. 43 U.S.C. §§ 1301–1315.

### B.     Navigability for riverbed title under the equal footing doctrine

The test for title navigability was first set forth by the U.S. Supreme Court in 1870, when it held a waterway is navigable if, in its ordinary condition at statehood, the river was either actually used or susceptible to use as a highway of commerce:

> Those rivers must be regarded as public navigable rivers in law which
> are navigable in fact. And they are navigable in fact when they are used, or
> are susceptible of being used, in their ordinary condition, as highways

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                                    8
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 17 of 69

for commerce, over which trade and travel are or may be conducted in
the customary modes of trade and travel on water.

*The Daniel Ball*, 77 U.S. 557, 563 (1870). To meet this test, evidence that

a waterway was actually used for navigation, especially extensive and continuous use for

commercial purposes, "may be most persuasive," but when "conditions of exploration

and settlement explain the infrequency or limited nature of such use," the susceptibility

for use as a highway of commerce may still constitute satisfactory evidence of

navigability. *Utah*, 283 U.S. at 82.

Navigability for title "concerns the river's usefulness for '"trade and

travel,"' rather than for other purposes." *PPL*, 565 U.S. at 600 (citation omitted).

Evidence of susceptibility "must be confined to that which shows the river could sustain

the kinds of commercial use that, as a realistic matter, might have occurred at the time of

statehood." *Id.* Courts may consider evidence of present-day travel to determine a river is

navigable, but "(1) the watercraft [must be] meaningfully similar to those in customary

use for trade and travel at the time of statehood; and (2) the river's post-statehood

condition may not be materially different from its physical condition at statehood." *Id.* at

601.

It is well settled that courts can consider "segments" of rivers and determine

whether each segment is navigable. *Id.* at 594-96. "Physical conditions that affect

navigability often vary significantly over the length of a river . . . [S]hifts in physical

conditions provide a means to determine appropriate start points and end points for the

segment in question. Topographical and geographical indicators may assist." *Id.* at 595.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                9
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 18 of 69

## C. "Navigability" under other tests and for other purposes

"Navigability" is often assessed in different contexts, using the same word but applying different tests that have different sources of law and different purposes. In *PPL*, the Supreme Court pointedly "noted . . . that the test for navigability is not applied in the same way in these distinct types of cases." *PPL*, 565 U.S. at 592. A court must distinguish the type of navigability it is addressing and not intermingle case law addressing the various types. *Id.* at 592-93; *Kaiser Aetna v. United States*, 444 U.S. 164, 171 (1979).

The navigability standards for commerce clause regulatory authority and admiralty jurisdiction are significantly broader than the navigability-for-title test. "[N]avigability for purposes of the commerce clause authority to legislate, has been expanded to . . . waterways never navigable but which may become so with reasonable improvements." *Boone v. United States*, 944 F.2d 1489, 1495 (9th Cir. 1991). Similarly, the broader test of regulatory navigability is not confined to streams that are or can be used in their natural condition, and is not linked to watercraft customarily used in commercial trade and traffic at time of statehood. *Id.* at 1495-96; *PPL*, 565 U.S. at 592; *Mont. Power Co. v. Federal Power Comm'n*, 185 F.2d 494 (D.C. Cir. 1950).

In addition to the federal tests, Alaska has its own definition of what constitutes navigable waters. *See Harrison v. State*, No. A-13276, 2022 WL 1769132, at *3 n. 7 (Alaska Ct. App. Jun. 1, 2022) (acknowledging the federal and state tests are different and have different effects). "Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders,

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                  10
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 19 of 69

while federal law determines riverbed title under the equal-footing doctrine." *PPL*, 565 U.S. at 604. Alaska's test, like many states, sets a substantially lower bar for "navigability" than the federal equal footing doctrine test, including by defining purely recreational use as "navigation." ALASKA STAT. ANN. § 38.05.965(14) (West 2022) (defining "navigable water" to include "floating of logs, landing and takeoff of aircraft, and public boating, trapping, hunting of waterfowl and aquatic animals, fishing, or other public recreational purposes . . . ."). Alaska law maintains that the public has a right to access and use purely recreational waters, even though the State does not own the submerged lands underlying those waters. *See State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1211–12 (Alaska 2010) (citing Alaska Const. art. VIII, § 14; ALASKA STAT. ANN. § 38.05.126(c) (2022)).

### D. The summary judgment standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The non-moving party has a duty only to come forth with evidence from which a jury or a judge could reasonably render a verdict in the non-moving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The evidence of the party opposing summary judgment is to be believed, and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec.*, 475 U.S. at 587; *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387. *See also*, *Munoz v. Albuquerque A.R.T. Co.*, 829 F. Supp. 309, 314 (D. Alaska 1993) ("In resolving the motion for summary judgment, all reasonable inferences will be drawn in favor of the non-movants."), *aff'd*, 38 F.3d 1218 (9th Cir. 1994). The weighing of evidence and the making of credibility determinations are not proper functions of the court as it considers a motion for summary judgment. *Anderson*, 477 U.S. at 255; *Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072, 1076 (9th Cir. 2001).

## II. Factual Background

### A. From its headwaters at Slate Creek and Independence Creek, the North Fork of the Fortymile River changes character several times while continually increasing in volume until it flows into the main stem of the Fortymile River, which then flows into the upper Yukon River.

This case concerns the uppermost 16 miles of the Fortymile River's 59.3-mile-long North Fork.[3] The North Fork flows generally southeast into the 60-mile-long main stem of the Fortymile River.[4] The main stem then flows generally northeast through

---

[3] *See infra*, Background Part III; Fuller Report 1-3, attached as Ex. B.
[4] Greenwald Report 1, attached as Ex. C. All page numbers refer to original pagination.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          12
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 21 of 69

Eastern Interior Alaska, across the Canadian border, and into the upper Yukon River.[5]

The Fortymile River drains an area approximately 6,350 square miles,[6] which area is

called the Fortymile basin. The basin receives an average of 15.5 inches of precipitation

per year, a third of which occurs during winter.[7] A map is below.



*Map of rivers and watersheds, from Fuller 4.*

The river is typically frozen from mid- to late-October through late-April to early-

May.[8] In May, the ice starts to break up in the river while the snow melts and water flows

into the valley, causing the river's volume to surge.[9] After the melt, the volume of water

---

[5] *Id.*

[6] *Id.*

[7] *See* Mussetter Report 32, attached as Ex. D.

[8] *Id.*

[9] *See id.* at 59.

drops to its relatively low baseline, but jumps episodically in response to individual rainstorms.[10] These sudden jumps and quick declines in volume after rainfall are caused by the shallow bedrock on the upper slopes and the permafrost in the valley bottoms (the slopes do not absorb, hold, and otherwise slow down the rain that falls on them).[11]



*Map of the disputed reach, created for demonstrative purposes.*

The headwater of the North Fork is formed by the confluence of Slate Creek and Independence Creek.[12] Those creeks drain an area totaling about 305 square miles and the

---

[10] *Id.* at 32, 113.
[11] *See Id.* at 32.
[12] *Id.* at 34-35, 83.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                14
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 23 of 69

mean flow volume is 314 cfs.[13] The North Fork headwater starts in the mountains, at 2,130 feet above mean sea level, and drops approximately nineteen feet per mile over the length of the disputed segment.[14]

For its first approximately ten miles, the North Fork is a single-thread channel because its banks are bedrock-controlled, but the channel is filled with many boulders.[15] For the next six miles, the North Fork becomes a wider, wandering channel, sometimes split, and with shallow riffles.[16] By this point, a few relatively small mountain tributaries have contributed additional water, making the North Fork's estimated mean volume 530 cfs immediately above Champion Creek.[17]

At the confluence with Champion Creek, the North Fork gains over a third more water and becomes a deeper, slightly flatter channel that is free of boulders.[18] At the confluence itself, however, Champion Creek deposits substantial sediment and causes unstable shallow riffles.[19] These shallow riffles end 0.3 river miles downstream of the confluence, when the river runs up against the first bedrock bank that controls the width of this otherwise wandering channel.[20] From this point downstream, the United States has

---

[13] Fuller Report 7.
[14] *Id.*; Mussetter Report 37.
[15] Mussetter Report 37, 42-43.
[16] *Id.* at 37, 43, 92, 94.
[17] Fuller Report 29; Fuller Deposition 94:18-95:20, attached as Ex. E ("Fuller Dep.").
[18] *See* State Ex. 4, Dkt. 52.4. Mussetter Report 40, 43-44. Champion Creek's drainage is 24% of the total North Fork watershed acreage above the Middle Fork confluence. Fuller Report 7. Indeed, it is such a significant tributary that it has its own Wild and Scenic River designation. *See id.* at 36-38.
[19] Mussetter Report 43-44.
[20] *See id.*

disclaimed any interest and its navigability is not at issue in this case.[21]

Between Champion Creek and the Middle Fork, the North Fork drops 16 feet per mile, which is 17% less steep than the upriver segment.[22] Immediately above the Middle Fork confluence, the North Fork's mean volume is 753 cfs.[23]

At the Middle Fork confluence, the North Fork more than doubles in volume, with the Middle Fork providing about 60% of the total water volume at that confluence (the North Fork provides the other 40%).[24] The North Fork then becomes an even flatter bedrock-controlled single-thread channel dropping about ten to eleven feet per mile.[25] Over this extent, there are numerous submerged boulder riffles and two named white-water features.[26] The "Chute" a short class 2 rapid, and the "Kink" rapids, a three-quarter-mile long class 4 rapid.[27] After the Kink, the North Fork becomes progressively deeper, with higher water volumes, and fewer riffles until it reaches the main stem of the Fortymile.[28] At that point, the North Fork drains an area of approximately 1825 mi$^2$ and has a mean volume of 1783 cfs.[29]

---

[21] *See* Dkt. 48.
[22] Mussetter Report 43.
[23] Fuller Report 15-17, 29.
[24] Mussetter Report 2.
[25] *Id.* at 44.
[26] *Id.*
[27] *Id.* at 37, 43-44, 153, 190.
[28] *See id.* at 45-46.
[29] *Id.* at 33; Fuller Report 29 (Table 10).

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    16
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 25 of 69

**B.      People have long settled in and traveled through the Fortymile basin using multimodal travel**.

Indigenous groups and non-Alaska natives used the Fortymile basin well before statehood. Two Athabaskan Indigenous groups used the basin before and after non-Alaska Natives arrived in the region in the mid-nineteenth century.[30] The Upper Tanana's territory covered parts of the southern and western portions of the basin, and included a village on the Middle Fork.[31] The Han's territory was largely to the east, centered on the Upper Yukon River, and the Han hunted caribou in the Fortymile basin.[32]

Commercial fur trappers operated in the region beginning in the middle of the nineteenth century and expanding in the 1880s.[33] Prospectors discovered gold in the Fortymile basin in 1886, and the discovery quickly drew non-Alaska Natives to the basin.[34] They typically reached the region either by traveling overland through Canada to the upper Yukon, or they took steamboats up the Yukon from the Bering Sea.[35] To get into the basin, some took boats up the main stem of the Fortymile, others traveled in winter using sleds, and still others used overland trails that ran from the Fortymile north to the town of Eagle and south to Tanana Crossing and Valdez.[36]

---

[30] Greenwald Report 1 & n.4.
[31] *Id.* at 1.
[32] *Id.*
[33] *Id.* at 1 & n.5.
[34] *Id.* at 1 & n.6.
[35] *Id.* at 1.
[36] *Id.*

Miners and others in the Fortymile basin practiced "multimodal travel," meaning they combined travel on foot, by dog sled, and by boat.[37] This allowed people to get places that were not reasonably accessible solely by boat, including because the waterways were too shallow or rocky.[38] "When they switched from water to foot travel, they could stow (cache) their boats on land for later use. They might return later to their cached boats to float back downstream."[39]

C.   **Despite extensive evidence recording pre-statehood use of downstream reaches in the Fortymile and Yukon River system, there is no evidence recording pre-statehood use of the North Fork above Champion Creek**.

The people who lived and mined in the Fortymile Basin left historic evidence of their travels on water through the area.[40] These accounts include documentation on several tributaries of the Fortymile and, specific to the North Fork, they report pre-statehood use of increasingly small boats used increasingly farther upstream until, at various points, people found travel by water was not useful and instead traveled overland or—where a destination did not yield a resource sufficiently valuable to justify the arduous journey—stopped traveling there altogether.[41] This included use of steamboats up the mouth of the Fortymile, poling boats from the head of steam navigation then up the North Fork to the Kink, and small boats above the Kink but below Champion Creek.[42]

---

[37] *Id.* at 5.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 4.
[41] *Id.* at 23-24.
[42] *Id.* at 10-12.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    18
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 27 of 69

There is no documented evidence of pre-statehood boat use on the North Fork headwaters, above Champion Creek.[43]

A steamboat first traveled up the Yukon to the confluence with the Fortymile River in 1887.[44] Although the Fortymile was "ordinarily not regarded as navigable" by steamboats, some traveled up the main stem of the Fortymile about 20 or 30 miles, remaining in Canada and thus less-than halfway to the North Fork.[45] There is one account of a steam-powered boat traveling across the border into Alaska and making it as far upstream as Steele Creek.[46]

Miners and freighters used long, narrow craft called "Yukon poling boats" in the Fortymile basin to travel where steamboats could not.[47] During the early gold rush, poling boats were used to move supplies up the Fortymile, although sledding supplies in winter appears to have been the preferred method of moving freight to mining sites in the area.[48] An 1895 guide to the Yukon gold fields reported that moving freight by a combination of poling boat and packing in the summer was more than twice as expensive as using dog sleds to haul freight in the winter ($30 per hundred pounds in the summer versus $10–$13 in the winter).[49] "Poling boats made slow progress upstream: it took a

---

[43] *Id.* at 21.
[44] *Id.* at 10 & n.32.
[45] *Id.* at 11 (citation omitted).
[46] *Id.*
[47] *Id.* at 12.
[48] *Id.* at 14.
[49] *Id.*

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          19

week to travel from Fortymile Post to the village of Chicken in 1903 and cost $15 per ton."[50]

Despite the costs of poling and packing up the Fortymile and its tributaries, direct evidence shows multiple miners nonetheless poled up the North Fork as far as the Kink, a feature about 21 river miles below Champion Creek. In its 1983 Memorandum Navigability Determination for the Fortymile River Basin, BLM stated that "[i]n 1900 a miner and his partners on several occasions hauled a boat loaded with 3,000 to 8,000 pounds upstream to the Kink."[51] Those miners changed the character of the North Fork significantly by blasting through a rock outcropping at the Kink in order to drain a former riverbed and allow for easier (though ultimately unsuccessful) mining.[52] This created the Kink rapids at the blast site. Thereafter, the rapids have been a barrier to upstream travel by water.[53] BLM found the upriver segments non-navigable in the 1983 Navigability Memorandum.[54] Interior formally recognized State ownership of the North Fork's riverbed below the Kink through a 2018 Recordable Disclaimer of Interest.[55]

In addition to the miners who blasted the Kink after moving people and supplies there by boat, there is another account of a miner who himself traveled up the North Fork to a point below the Kink, where he cached his boat then traveled overland to a mining

---

[50] *Id.* at 14.
[51] BLM 1983 Memorandum Navigability Determination for the Fortymile River Basin at 1, US-MFR0004716, attached as Ex. F ("BLM 1983 Nav. Mem.").
[52] *Id.*
[53] Mussetter Report 1.
[54] BLM 1983 Nav. Mem.
[55] State Ex. 4, Dkt. 52-4.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    20

camp on one of the North Fork's more significant tributaries.[56] While below the Kink, that miner encountered another boating downriver.[57] The other miner reported having prospected on a tributary of Slate Creek, but did not say which segments of his journey from that point he had traveled over land, and which segments he had traveled on water.[58]

There is only one historic pre-statehood account of boat use above the Kink. In 1904, a government surveying party traveling from Eagle to Kechumstuck reported using "small boats" to transport their camp on the North Fork above the Kink but below Champion Creek.[59]

> **D.**   **The only demonstrated floating on the disputed reach occurred decades after statehood, downstream only, using modern inflatable rafts that often strike obstacles or must be dragged over boulders and riffles**.

The North Fork was first floated (or float-dragged) downstream from its headwaters to Champion Creek in the 1980s by BLM employees. It started being floated by adventure-seeking hunters and their outfitter in 2005 or 2006, and it has been floated since 2018 for purposes of this litigation. Other potential floaters have chartered air transportation to the North Fork headwater, but decided not to float this segment after seeing it (instead putting in below Champion Creek).[60] All trips have been downstream-only using modern inflatable rafts.

---

[56] Greenwald Report 17-18.
[57] *Id.*
[58] *Id.* at 39-41.
[59] Greenwald Addendum 1, attached as Ex. G.
[60] Mills Deposition 11:13-12:12, 37:23-40:13, attached as Ex. H ("Mills Dep.").

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    21
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 30 of 69

On the first documented trip on the disputed reach, in 1987, two BLM employees floated downstream in an inflatable raft for purposes including recreational assessment, and to check whether radio signals could reach them.[61] In their field notes, the employees wrote the disputed reach was "more of a creek than a river," and noted that the strenuous dragging served to remind them that they were there for work, not pleasure.[62]

The next known trip on the North Fork above Champion Creek did not happen until nearly twenty years later, when hunt planner Bartlett floated the reach using a pack raft in 2005 or 2006.[63] After doing so, Bartlett determined the reach was likely floatable (or able to be float-dragged) in low-draft rafts that he had designed, manufactured, and rented to clients for use on other rivers.[64] But Bartlett's initial clients found it so arduous to float-drag from their put-in point until they reached the North Fork's deeper more bedrock-controlled segment below Champion Creek that they could not focus on hunting and did not return as clients.[65] Until 2012, Bartlett received many complaints and no repeat customers.[66] This changed only after Bartlett designed and manufactured a second generation of inflatable rafts to carry more, draft less, and make dragging easier.[67] The rafts were manufactured from PVC materials so they could be dragged over rocks and

---

[61] Aug. 1987 Notes at 5.
[62] *Id.* at 5-6.
[63] *See* Bartlett Declaration ¶ 14, attached as Ex. I ("Bartlett Dec."); *see also* Bartlett Deposition 46:10-47:21, 49:4-51:23, 69:15-70:15, attached as Ex. J ("Bartlett Dep.").
[64] Bartlett Dec. ¶¶ 19-22.
[65] *Id.* ¶¶ 16-17; *see also* Bartlett Dep. 50:9-51:8.
[66] Bartlett Dec. ¶ 17.
[67] *Id.* ¶¶ 19-22.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                22

riverbed with less friction than rubber materials.[68] Even using these specially designed

ultra-low-draft modern rafts, Bartlett said his client's blood pressure could lower only "a

little" after floating onto the North Fork from Slate Creek, and said it was not until

Champion Creek when his clients could relax because they had reached a clear channel.[69]

      The State seeks to attribute the lack of floating on the North Fork above Champion

Creek solely to a lack of "access." Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J.

67, Dkt. 52 ("Mem."). Putting aside the self-defeating nature of this argument (if the

segment were part of a useful public highway of transportation, the segment itself should

provide access), it is also untrue. For example, at least one witness—identified by the

State—testified that he chartered a helicopter to put him in on the North Fork headwater

so he could survey it for potential archeological sites.[70] He wanted to go "as far up the

river as [he] could go" and raft down.[71] From aerial reconnaissance he determined that

point to be Champion Creek.[72]

## III.   Procedural History

      Upon the State's application, the United States filed a recordable disclaimer of

interest in 2018 recognizing that the the North Fork is navigable below the Kink, and that

---

[68] Bartlett Dec. ¶¶ 21, 22.

[69] Bartlett Dep. 35:18-20. The State asserts, without citation, that Bartlett only said
"dragging [would] almost certainly be required on Slate Creek before it joins the North
Fork." Mem. 70. Not so. Bartlett testified that he considers the trip to be a float-drag trip
from the put in at Slate Creek until Champion Creek. Bartlett Dep. 34:25-35:24.

[70] Mills Dep. 11:13-12:12, 37:23-40:13.

[71] *Id.*

[72] *Id.*

the State owns the submerged lands below that point.[73] When seeking a recordable disclaimer of interest the State must present evidence that a watercourse running through federal lands is navigable under the equal footing doctrine.[74] Navigable waters specialists with the Bureau of Land Management then review that evidence, collect additional evidence, and recommend whether a disclaimer should issue.[75] Those specialists cannot bind the United States, however; the disclaimer decision can only be made by an official with delegated authority.[76] All of this occurred with respect to the North Fork below the Kink.[77] But the State did not request a recordable disclaimer of interest above the Kink.

On November 8, 2018, the State sued under the Quiet Title Act, 28 U.S.C. § 2809a, seeking title to the submerged lands underlying the North Fork above the Kink, and all submerged lands underlying the Middle Fork.[78] Discovery concluded on April 8, 2022. On July 6, 2022 the United States filed a disclaimer pursuant to 28 U.S.C. §

---

[73] State Ex. 4, Dkt. 52-4.
[74] *See* 43 C.F.R. §§ 1864.1-1; Frost Deposition 25:1-30:10, attached as Ex. K ("Frost Dep.").
[75] *See* 43 C.F.R. §§ 1864.1-1; Frost Dep. 25:1-30:10
[76] *See* 43 C.F.R. § 1864.2; Frost Dep. 25:1-5.
[77] *See* State's Exhibit 4, Dkt. 52-4.
[78] Dkt. 1.

2409a(e) for some of the submerged lands.[79] As a result of that filing, only the submerged

lands underlying the uppermost sixteen miles of the North Fork are at issue in this case.[80]

## IV.  Separate Summary of Undisputed Facts

*Pre-statehood*

- Native people and European settlers lived and mined in the Fortymile Basin for many years before Alaska became a state in 1959.

- Historic evidence states people used other river segments in the Fortymile Basin for trade and travel on water prior to 1959.

- Historic evidence states that pre-statehood miners used a poling boat to move equipment on water from the Fortymile River up the North Fork to a feature known as "the Kink," which feature is about 21 river miles below Champion Creek.

- Historic evidence states that other pre-statehood miners used poling boats on the North Fork below the Kink.

- No historic evidence states poling boat were ever used above the Kink.

- Historic evidence states that a pre-statehood survey party used "small boats" to move a camp on the North Fork above the Kink but below Champion Creek.

---

[79] Section 2409a(e) of the QTA provides that: "If the United States disclaims all interest in the real property or interest therein adverse to the plaintiff at any time prior to the actual commencement of the trial, which disclaimer is confirmed by order of the court, the jurisdiction of the district court shall cease unless it has jurisdiction of the civil action or suit on ground other than and independent of the authority conferred by section 1346(f) of this title [the section providing jurisdiction over QTA actions]." A court's confirmation of the disclaimer is largely "a formality." *See W.H. Pugh Coal Co. v. United States*, 418 F. Supp. 538, 539 (E.D. Wis. 1976). As long as there is no question that its disclaimer is valid and was made in good faith, the court must confirm the United States' disclaimer of interest in disputed lands. *See Lee v. United States*, 629 F. Supp. 721, 726 (D. Alaska 1985).

[80] *See* Dkt. 48.

- No historic evidence states that people used the segment of the North Fork at issue in this case for trade or travel on water prior to 1959.[81]

*Post-statehood*

- The disputed reach of the North Fork is in the same "ordinary and natural condition" as when Alaska became a state in 1959.

- The disputed reach of the North Fork has significant natural beauty, the United States designated it as a Wild and Scenic River, and BLM has promoted recreational rafting and canoeing on Wild and Scenic Rivers throughout the region.[82]

- In August 1987, two BLM employees floated and dragged their way downstream from the headwater using an inflatable raft for reasons including assessing recreation.[83]

- The next known trip on the disputed reach of the North Fork occurred nearly 20 years later, in 2005 or 2006. On that trip, a hunt planner floated the segment downstream in a pack raft to see whether it was possible for hunters to float in modern inflatable rafts.[84]

- From 2007-2011, Bartlett outfitted "float-drag" hunting clients with modern Hypalon inflatable rafts he specially designed and arranged air transportation for them to reach a put in on Slate Creek via 40Mile Air. The clients reported that the thrip was unduly arduous until they reached Champion Creek such that the clients could not focus on hunting. Bartlett

---

[81] The State writes in its Memorandum that "[e]vidence of *actual* pre-statehood navigation of this segment exists, [but] that evidence may be subject to disputes of material fact." Mem. 62-63 (citing State Ex. 8 at 10, State Ex. 9 at 2-3). The referenced documents, however, do not say people traveled on water from tributaries of the North Fork headwaters to get to the Fortymile, or even that they had boats; they show only that people were at a location upriver and traveled to a location downriver. *See id.* The Supreme Court has made clear that even stronger evidence showing actual river use "is not itself enough." *PPL*, 565 U.S. at 600 (discussing accounts of "[m]ere use by initial explorers or trappers, who may have dragged their boats in or alongside the river despite its nonnavigability"). If anything, this evidence shows the disputed segment was not navigable since it establishes people moved through the corridor, while no evidence exists that says people used boats to do so.

[82] State Ex. 1, Dkt. 52-1.

[83] Aug. 1987 Notes at 5.

[84] *See* Bartlett Dec. ¶ 14; *see also* Bartlett Dep. 46: 10- 47:21, 69:15 – 70:15.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          26

had no repeat customer for this route during these years and, in response, designed new rafts with new materials.[85]

- Starting in 2012 and every year since then, Bartlett outfitted float-hunt clients with his second generation modern inflatable rafts made from PVC material and designed with larger tubes especially at the bow and stern to accommodate heavy loads without increasing drafts.[86] Bartlett arranged for the clients to be transported via 40Mile Air to the put in on Slate Creek.[87] Clients still drag their rafts often, but the trip is much improved and has become Bartlett's most popular booking.[88]

- Starting in 2018, the State of Alaska and the United States sent parties to float the disputed reach related to this litigation. All parties used modern inflatable rafts. All parties needed to drag their rafts for distances above Champion Creek and also struck obstacles on their trips.[89]

- At least one federal employee chartered a helicopter desiring to put in at the North Fork headwater, but instead put in at Champion Creek and floated downriver from there because his aerial reconnaissance revealed that the North Fork above Champion Creek was not useful for rafting.[90]

- There is evidence that people have traveled upriver to the Kink using outboard propeller powered boats.[91]

- There is no evidence before or after 1959 of any motor-powered boat travel above the Kink, which is about 21 river miles below Champion Creek.

- There is no evidence before or after 1959 of any upstream travel above the Kink, which is about 21 river miles below Champion Creek.

---

[85] Bartlett Dec. ¶¶ 15-17.

[86] *Id.* ¶ 22.

[87] *Id.* ¶¶ 14-15.

[88] *Id.* ¶ 22.

[89] *See* Cooper Deposition 49:23-50:21 (recalling dragging), attached as Ex. L ("Cooper Dep."); Frost Dep. 108:7-111:20; Frost July 2018 Field Notes, Ex. M p. 2-8 (noting over 20 drags on disputed reach), attached as Ex. M ("Frost July 2018 Field Notes") Whittaker & Shelby Report 29 (reporting hitting obstructions 107 times without coming to a stop, hitting obstructions that brought raft to a stop on 5 occasions, and 2 instances where operator needed to drag his raft), attached as Ex. N.

[90] Mills Dep. 9:10-13:23, 37:23-38:25.

[91] July 6, 1983 Memorandum, attached as Ex. O ("July 1983 Mem.").

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    27

I.      **Alaska Cannot Show that the Disputed Reach of the North Fork Was Used or Is Susceptible of Being Used, in its Ordinary Condition, as a Highway for Commerce, over which Trade and Travel Are or May Be Conducted in the Customary Modes of Trade and Travel on Water at the Time of Statehood**.

A.      **Susceptibility to downstream-only floating for recreation and government purposes is legally insufficient to make a river navigable in fact**.

Alaska cannot show that the disputed reach of the North Fork is susceptible to use as a highway for commerce and public transportation because downstream-only floats undertaken for hunting and government purposes are legally insufficient to make a river navigable under the equal footing doctrine. Such floats do not use the river as a "highway" of commerce, are not transportation on water for profit, and do not show the river is one of general and common usefulness for purposes of trade and commerce. The undisputed facts show that, after statehood, a hunt planner, adventure-seeking sport hunters, and employees of the Bureau of Land Management have float-dragged down the disputed reach for hunting and government purposes.[92] Additionally, because of this litigation, representatives from the State and the United States have traversed the disputed segment downstream using modern inflatable rafts.[93] The State's recreational rafting witnesses intend to offer an assessment of the reach's susceptibility to recreational floating based on natural beauty, available campsites, and how often the witnesses hit rocks or dragged their rafts on a given float.[94] The United States does not dispute the

---

[92] *See supra*, Background Part II.D.
[93] *See supra*, n.89.
[94] Whittaker & Shelby Report 13-14, 29 (reporting regarding float on the disputed reach,

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          28
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 37 of 69

reach is a beautiful wilderness that can be float-dragged downstream in modern inflatable rafts, but respectfully requests a ruling that even if the reach were susceptible to these same uses at the time of statehood, those uses would not render the watercourse navigable in fact under the equal footing doctrine.

Determining whether a waterway is navigable under the equal footing doctrine, "concerns the river's usefulness for ' "trade and travel," ' rather than for other purposes." *PPL*, 565 U.S. at 600 (citation omitted). Under this standard, a navigable river must have "general and common usefulness for purposes of trade and commerce." *Oregon*, 295 U.S. at 23. And as the Ninth Circuit has held, it does not "render a water course navigable" when that watercourse "is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes." *N. Am. Dredging Co. of Nev.*, 245 F. at 300.

Courts have long held that waterways susceptible only to personal recreational uses like pleasure boating and hunting, are not navigable in fact as useful highways of commerce. In *Oregon*, the Supreme Court rejected the use of boats by trappers and duck hunters as proof of navigability. *See Oregon*, 295 U.S. at 21. Likewise, in *Toledo Liberal Shooting Co. v. Erie Shooting Club*, 90 F. 680, 682 (6th Cir. 1898), the Sixth Circuit found that use of "canoe and flat-bottomed ducking boats" to "navigat[e]" waters in order to hunt ducks and other waterfowl did not render those waters navigable in fact. *Id*. The Court noted that "[t]he same test would convert every pond and swamp capable of

---

"Whittaker's criterion craft (14 foot raft with about 900 pounds) had 107 hits, 5 stops, and 2 boat drags at 700 cfs on (Aug 27, 2019), with most of these issues occurring in the first four miles").

floating a boat into a navigable stream or lake." *Id.*; *see also State of North Dakota, ex rel. Bd. of Univ. & School Lands v. United States*, 972 F.2d 235, 239 (8th Cir. 1992) (affirming as correct decision that held float-hunting use of a river, even if undisputed, "does not support a finding of navigability, because it does not prove that the River was used as a highway for useful commerce"); *United States v. Ladley*, 4 F. Supp. 580, 584 (D. Idaho 1933) (139.4 acre lake used for "pleasure boating, hunting, and fishing" not navigable in fact).

The Ninth Circuit's decision in *State of Alaska v. Ahtna, Inc.*, does not hold otherwise and is distinguishable from the uses here because it dealt with a substantial industry of waterborne "transportation for profit." 891 F.2d at 1405. The *Ahtna* court said a use cannot be ignored simply because it "relates to the recreation industry," *Id.*, but it did not say that everything related to the river recreation industry constitutes use of a river as a highway of commerce.[95] It could not have so held, because doing so would have violated numerous binding precedents. *E.g.*, *Oregon*, 295 U.S. at 21; *N. Am. Dredging Co. of Nev.*, 245 F. at 300.

*Ahtna* addressed the navigability of the lower 30 miles of the Gulkana River, from Sourdough Campground to the Gulkana's mouth at the Copper River, which was used for two-way riverboat travel. *See Ahtna*, 891 F.2d at 1402-03; Gulkana Stipulations at 56 (describing personal use of powerboat with lift starting in late 1940s to travel downriver

---

[95] In effect, Alaska's position would merge the federal law test used to determine who owns the beds of navigable rivers, with the more lenient state law test that allows the public to use any waterways that can be boated for recreation even if the State does not own the riverbeds under those waters.

ten miles, then back upriver and describing post-1978 use of 20-foot aluminum boat with outboard propeller motor without lift to travel upriver), attached as Ex. P ("Gulkana Stips."). The parties stipulated that the segment at issue was ordinarily 3 feet deep for those 30 miles, except at the single shallowest point where the river was ordinarily 1.5 feet deep. *Ahtna*, 891 F.2d at 1402. Other than that single 1.5-foot-deep point,[96] the parties agreed the river could be and was traveled by a variety of craft including "flat or round-bottom aluminum or fiberglass powerboats 16 to 24 feet long by 4 to 10 feet wide." *Id.* at 1402-03. At the time *Ahtna* was decided, 20 boats carried 60 people on a typical summer weekend day and charged about $150 per person per trip. *See id.* at 1403. In sharp contrast to the Gulkana River, the only transportation for profit that occurs related to the North Fork headwater occurs *by air* because the disputed reach is not a useful highway. *See* Mem. 67 (acknowledging business's only profit is derived from hunters "contracting their services for outfitting and air transport," not for water transport).

Even if rafting guides were to accompany some of the people floating down the disputed reach—which they do not—this would not make the reach navigable because the guides are not providing "transportation for profit" or using the river as a "highway." Unlike riverboat captains on the lower Gulkana, a guide on a wilderness rafting trip is not getting paid to provide "transportation" to the take-out point, but for other purposes like

---

[96] Although in *Ahtna* the court recognized the 1.5-foot-deep area as a break in use by boats, the State in this case asserts that nearly any boat can operate in less than sixteen inches of water, which is two inches less than 1.5 feet of water. *See id.*

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          31
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 40 of 69

providing knowledge and a sense of safety. No person has ever charged a fee for the purpose of moving people up or down the disputed segment of the North Fork, and it is not susceptible to such use. Although, in *Ahtna*, the Ninth Circuit said "[i]t is not essential that [a] river be used for the transportation of water-borne freight by a carrier whose purpose is to make money from the transportation," it made clear that a navigable river must still be useful as a "highway." *Ahtna*, 891 F.2d 1404 (citing *Utah v. United States*, 403 U.S. 9, 11 (1971)) as its example because there, it explained, "ranchers transporting own cattle from mainland to islands *used the river as a highway*" (emphasis added) (citation omitted)). The North Fork headwater is the attraction, not the highway.[97]

B. **"Mere depth of water" is legally insufficient to make a river navigable in fact**.

As a matter of law, a court cannot rule that a river is susceptible to navigation under the equal footing doctrine based solely on evidence that the watercourse has a certain depth and width because those features, without more, do not make that watercourse a useful highway for commerce. Indeed, the law is clear that "[m]ere depth of water, without profitable utility, will not render a watercourse navigable." *N. Am. Dredging Co. of Nev.*, 245 F. at 300. Alaska nonetheless asserts the Court can resolve this case solely on its claim that the depth of the water in the disputed reach is greater than the static draft of a handful of craft, or that at least the water is deep

_____

[97] Nor does demonstrating susceptibility to other non-commercial or non-highway uses allow the State to clear the bar. Government employees managing or studying a waterway are not using the waterway as a highway of commerce. A contrary rule would still "convert every pond and swamp capable of floating a boat into a navigable stream or lake," *Toledo Liberal Shooting Co.*, 90 F. at 682.

enough to float a boat in most places for a non-contiguous majority of time over a three month period. *See* Mem. 65-66. Even if factually true,[98] such a ruling is contrary to law and the United States respectfully requests a ruling to that effect.

The Supreme Court has directed courts to consider, and courts have considered, many factors beyond depth to determine whether a watercourse has profitable utility as a useful highway of commerce, thus making it navigable in fact. These include, but are not limited to:

- The length of the watercourse. *N. Am. Dredging Co. of Nev.*, 245 F. at 300 (a watercourse must "continue long enough to be useful and valuable in transportation");

- Whether the watercourse is "dependable." *Id.* (any "fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon");

- The products of the country through which a watercourse travels. *Harrison v. Fite*, 148 F. 781, 783 (8th Cir. 1906) ("[A] water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs"); *see also United States. v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699 (1899) (explaining watercourse "must be generally and commonly useful to some purpose of trade or agriculture");

- Whether the watercourse has any obstructions. *North Carolina by & through N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 145 (4th Cir. 2017) (considering "swift-moving" water, "steep slopes, narrow valleys, rapids, falls, ledges, and exposed rock" in finding

---

[98] Contrary to Alaska's claim, the depth of water is disputed. *See infra*, Argument Part II.B. The State's assertion that depth alone is sufficient to prove navigability in any watercraft also contradicts its stipulations in *Ahtna*. *See* Gulkana Stips. at 15-16 (stipulating that river with an average depth of one-to-three feet could be traveled downriver only and only using inflatable rafts, canoes, and kayaks because of river conditions other than depth).

watercourse non-navigable), *as amended* (May 3, 2017);

- The impact of multiple obstructions taken together. *Id.* at 152 (explaining that "avoiding [identified] obstacles would have been difficult, especially because of the high speed of the river, which decreased the amount of time that navigators had to react" in finding watercourse non-navigable);

- The impact of conditions on a boat under load. *Id.* ("[T]hese canoes were very unstable and would have capsized if carrying a heavy load");

- The impact of being able to travel in only one direction. *Id.* ("[B]ecause these boats could not navigate upriver, they were ill-suited for commerce");

These factors emphasize that navigability under the equal footing doctrine must be based on the existence of a useful highway of commerce—not just the existence of a watercourse—and they recognize that depth is only one of several important variables that determines whether a useful highway of commerce existed.[99]

**C.     Watercraft considered in any susceptibility analysis must have been the "modes of trade and travel on water" that were "customary" at statehood.**

Alaska finally cannot use inflatable rafts, canoes, jet boats, and air boats to show that the disputed reach was susceptible to navigation because the State fails to show those watercraft were modes of trade and travel on water that were customary at statehood. The Supreme Court recently reiterated that "[f]or the susceptibility analysis, it must be determined whether trade and travel could have been conducted [at statehood] 'in the customary modes of trade and travel on water,'. . . ." *PPL*, 565 U.S. at 601 (quoting *Utah*, 283 U.S. at 76). Thus, any watercraft considered must have been (1) used for "trade and travel," meaning realistic "commercial use," (2) "customary" for those purposes, (3) at

---

[99] Bartlett Dep. 20:10-15, 24:22-25:8; Bartlett Dec. ¶ 9.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH            34
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 43 of 69

the time of statehood. *Id.* at 600-01. Alaska ignores these three interrelated elements, but nonetheless "requests that this Court issue a legal ruling establishing that susceptibility to navigation may be established by any of the range of boats discussed in [the State's] motion[.]" Mem. 66. To the contrary, the United States respectfully requests an order ruling that the undisputed facts establish inflatable rafts, canoes, jet boats, and air boats were not customary modes of trade and travel on water at statehood and therefore cannot be considered as part of any susceptibility analysis.

> **1.  Any watercraft considered must have been used for "trade and travel" that, as a realistic matter, might have occurred on the river at issue**

In order to be considered for a susceptibility analysis an historic watercraft must have been used for trade and travel. Navigability under the equal footing doctrine "concerns the river's usefulness for 'trade and travel,' rather than for other purposes." *PPL*, 565 U.S. at 600 (citing *Utah*, 283 U.S. at 75–76). Thus, "evidence must be confined to that which shows the river could sustain the kinds of commercial use that, as a realistic matter, might have occurred." *Id.* This includes the historic watercraft considered. *Id.* at 600-01.

Courts regularly find rivers non-navigable where there is evidence the river was boated in watercraft that are typical for "other purposes," rather than for useful commerce. *See, e.g.*, *Oklahoma v. Texas*, 258 U.S. 574, 589-591 (affirming non-navigability finding because "[b]oats with a sufficient draft to be of any service" could only be used during periods of high water); *North American. Dredging Co. v. Mintzer*, 245 F. 297, 299 (9th Cir. 1917) (rejecting as insufficient that a waterway was navigable

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    35
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 44 of 69

in "duck boats or punts"); *see also United States. v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698-99 (1899) (rejecting use of "a fishing skiff or gunning canoe" to prove navigability (citation omitted)); *United States v. Brewer-Elliot*, 249 F. 609, 623 (W.D. Okla. 1918) (finding river segment non-navigable because steamboats and "naphtha[] launches" could not use the segment, even though non-commercial "[s]kiffs could be used at any time"), *aff'd,* 270 F. 100 (8th Cir. 1920), *and aff'd,* 260 U.S. 77 (1922).

The State first fails to show its proposed historic watercraft were used for "commercial use that, as a realistic matter, might have occurred" on the disputed reach because the State cannot identify any commerce that reasonably could occur on the reach. *PPL*, 565 U.S. at 600. The State offers downstream-only recreational rafting but, as explained above, that use is insufficient to establish a river is navigable under the equal footing doctrine. Beyond that, Alaska invites the Court to speculate, asking "who knows what future mineral discoveries might draw commercial activity to the area[?]" Mem. 68. But when asked to identify commerce that reasonably could have occurred at Statehood, the answer cannot be "who knows?" Although the Supreme Court of Montana adopted this "who knows" approach (citing the same case the State cites in its Memorandum), the Supreme Court of the United States rejected that approach in *PPL. Compare PPL Montana, LLC v. State*, 229 P.3d 421, 446-47 (Mont. 2010) ("'[C]ommerce' in the navigability for title context is very broadly construed . . . emerging and newly-discovered forms of commerce can be retroactively applied to considerations of navigability"), *rev'd and remanded,* 565 U.S. 576, *with PPL*, 565 U.S. at 600 ("[T]he evidence must be confined to that which shows the river could sustain the kinds of

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          36
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 45 of 69

commercial use that, as a realistic matter, might have occurred at the time of statehood").[100] There are not now and have never been any commercial activities for which the river could be a useful highway, and the State cannot seek to establish navigability based on speculation that there could someday be newly discovered forms of commerce.

The second fatal flaw in Alaska's reasoning is that none of the referenced case law supports its contentions. In an apparent attempt to show downstream only recreational craft can be considered in a susceptibility analysis, the State asserts that "[c]ourts have considered navigation by rowboats, flatboats, canoes, and even floating logs." Mem. 62. But in two of the four cited cases, the courts noted the watercourse had been used by customary commercial craft in addition to those personal or recreational craft. *Utah*, 283 U.S. at 82 (recognizing use by "steamboats, motorboats, [and] barges"); *Nw. Steelheaders Ass'n, Inc. v. Simantel*, 112 P.3d 383, 392 (Or. Ct. App. 2005) (recognizing use by a sternwheeler).[101] Those cases, therefore, do not establish that personal or recreational craft, standing alone, are sufficient to show navigability.

The third case, *Hardy v. State Land Board*, is the only case the State identifies

---

[100] The State's suggestion that there could be future mineral discoveries, Mem. 68, also provides no reason to expect the river would be used as a highway because miners already travel to the Fortymile headwaters, and they do so exclusively by air. *See* Vanessa Thompson Deposition 30:8-31:12, attached as Ex. Q.

[101] The State also cites *Alaska v. United States*, 201 F.3d 1154, 1158 (9th Cir. 2000), to suggest canoes are sufficient, Mem. 62 n.215, but that case addressed only jurisdiction, not the merits of navigability, was decided before the Supreme Court laid out the now-prevailing legal framework through *PPL* and, in any event, discussed actual use by "motor boats and pole boats."

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                 37
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 46 of 69

where a court found a river navigable based on susceptibility to use by Native American dugout canoes standing alone. 360 P.3d 647 (Or. Ct. App. 2015). More fundamentally, however, this state court case has little persuasive value because it focuses exclusively on the draft of the dugout canoe to find the river susceptible (as the State frequently points out), and it fails to discuss the many other factors federal courts identify as significant. *Id.* Other courts have considered the instability of dugout canoes and found it significant. *N. Carolina by & through N. Carolina Dep't of Admin.*, 853 F.3d at 152. The state court also persisted in relying on cases decided in the regulatory-navigability context, even though the U.S. Supreme Court has said cases that do so evince an "infirm legal understanding" "for determining navigability which . . . would enlarge what actually passed to [a] State" when it entered the Union. *PPL*, 565 U.S. at 604-05 (quoting *Brewer-Elliot Oil & Gas Co. v. United States*, 260 U.S. 77, 88 (1922)). Even putting aside these weaknesses in the court's analysis, there was evidence in *Hardy* showing actual use of the river as a highway for "log drives," as well as evidence of actual use by ferries and "wooden boats." 360 P.3d at 656, 661. Moreover, in sharp contrast to the State's position here, that state court found dugout canoes "were customarily used by Native Americans in the area for trade and travel in 1859 [the year of statehood.]" *Id.* at 662. In so stating, the court there made the necessary findings that the State has not presented evidence to prove here.

Finally, on log drives, no court has ever found a river navigable under the equal footing doctrine based on mere "susceptibility" to log drives, as far as the United States is aware. Courts have found rivers navigable based on evidence of actual, substantial use of a river as a highway to transport logs. In particular, the State cites *State of Oregon By &*

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                                        38
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 47 of 69

*Through Division. of State Lands v. Riverfront Protectors Association*, which found the McKenzie River in Oregon navigable because "over a period of seventeen years[,] [t]housands of logs and millions of board feet of timber were driven down the river." 672 F.2d 792, 795 (9th Cir. 1982). The court also noted the logs were quite large and indeed, a review of the District Court order reveals that the timber felled and floated "averaged three to five feet in base diameter, sometimes rising 100 feet or more above ground level to the lowest limbs." *Oregon v. Riverfront Protective Assn.*, Case No. 70-cv-40, at *6 (D. Or. 1980), attached as Ex. R.[102] It should go without saying, but the use of a river to float logs to market cannot be reasonably equated to downstream-only pleasure boating.

## 2. Any watercraft considered must have been "customary" for the identified reasonable commercial use

The historic watercraft considered for a susceptibility analysis must have been "customarily used" for realistic trade and travel at the time of statehood. *See PPL*, 565 U.S. at 602 (recognizing the analysis must focus on "boats customarily used"); *see also NW. Steelheaders Ass'n*, 112 P.3d at 390 (Or. Ct. App. 2005) (discussing commercial vessels and holding that "the particular mode of transport [must] be one that was *common* at the time of statehood" (emphasis added) (citing *United States v. Utah*, 283 U.S. at 76)). Although the State makes no attempt to define customary, the United States' expert

---

[102] Like *Hardy*, this case also relies on precedent from the regulatory-navigation context to find log drives meet the test for the equal footing doctrine. *State of Oregon By & Through Div. of State Lands*, 672 F.2d at 794-95 (citing regulatory-navigability case *Puget Sound Power & Light Co. v. FERC*, 644 F.2d 785, 788-89 (9th Cir. 1981)). But this case did so before the Supreme Court identified the practice as resulting in overly expansive decisions in the equal footing doctrine context.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          39
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 48 of 69

historian relied on the Oxford English Dictionary to define "customary" in its ordinary sense as "the customs or usual practices associated with a particular society, place, or set of circumstances."[103] Merely demonstrating a watercraft physically existed at the time of statehood or that someone, somewhere, in some instance used a certain watercraft for a commercial purposes, does not prove that watercraft was customary for useful commerce in the Fortymile region.

Whether a boat was "customary" has both geographic and frequency-of-use components. A boat that was widely used in the lower forty-eight or in distant parts of Alaska cannot be said to be "customary" among the population that could have used the North Fork of the Fortymile River. Inversely, even a boat that was in the Fortymile River basin but was unusual, exceptional, or simply not used with any regularity also cannot be "customary." The historical record must establish that the boats in question were used with such frequency in the relevant geographic area that usage would have been considered "common," if not the norm. A boat that is exceptional, rare, or unusual at the time of statehood is not the proper lens through which to view whether the river was susceptible to use as a highway of commerce.

Two obvious examples make the point. Although Plains Indians used "bull boats" for hunting on rivers in the Great Plains like the Little Missouri River, it would make no sense to consider whether the North Fork was susceptible to use in a bull boat because those boats were never used by people in or around the Fortymile region (not to mention

---

[103] Greenwald Report i (citation omitted).

the fact that the Eighth Circuit rejected bull boats from consideration since they were not used for commerce). Nor would it make sense to consider whether the North Fork or any river in the Fortymile region was susceptible to use in a Bristol Bay Double-Ender. Although these boats were customary means of trade and travel in Bristol Bay, they were used hundreds of miles away to catch salmon; there is no commercial fishery in the Fortymile region. Not all boats in existence, or even in Alaska, merit consideration as customary means of trade and travel in the Fortymile region.

### 3. Alaska fails to focus its watercraft evidence on "the time of statehood," and its position is thus contrary to law.

The consideration of historic watercraft for a susceptibility analysis must focus on watercraft at the time of statehood. *PPL*, 565 U.S. at 600 (navigability under the equal footing doctrine "must be assessed as of the time of statehood"); *id.* at 601 ("If modern watercraft permit navigability where the historical watercraft would not, . . . then the evidence of present-day use has little or no bearing on navigability at statehood."). The "at-the-time-of-statehood" inquiry is key because it is the moment the state gains title to the property. *Id*. at 591 ("Upon statehood, the State gains title within its borders to the beds of waters then navigable."). Stated differently, Alaska must not only satisfy the "customary" and "trade and travel" elements described above; Alaska must also show that both elements existed at the time of statehood.

Applying "at the time of statehood" to the requirement that a craft be "customary" has the most obvious impact since there is often considerable lag between when products come to market and when they can be said to be the common or customary type of a

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH 41
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 50 of 69

given product class. Thus, even if a watercraft is ubiquitously used for commerce today and existed at the time of statehood, if that watercraft did not become "customary" for that purpose until after statehood, then it cannot be considered as part of a susceptibility analysis.

4. **Based on the Undisputed Facts, Certain Watercraft Cannot Meet the Legal Test**

a. *Inflatable rafts were used for a variety of "other purposes," but were not customary modes of trade and travel on water at statehood*

The State cannot prove that inflatable rafts customarily served commercial uses that, as a realistic matter, might have occurred at the time of statehood on the North Fork of the Fortymile River. To the contrary, Alaska's own evidence shows inflatable rafts were designed, sold, and used for "other purposes" than commerce. Isolated instances of use in a commercial application does not make inflatable rafts "customary" modes of trade and travel.

The State's expert only mentions the use of inflatable rafts in other states or other parts of Alaska for purposes of "river explor[ation];"[104] "recreational boating;"[105] "retaking of [two] Aleutian Islands,"[106] "floating the Colorado River,"[107] "hunting trips,"[108] "rescue[],"[109] and other non-commercial highway purposes. The State provides

---

[104] State Ex. 6 at 53, Dkt. 52-6.
[105] Rice Report 51, attached as Ex. S.
[106] *Id.*
[107] *Id.* at 53.
[108] *Id.* at 54.
[109] *Id.* at 55.

only one contemporaneous attempt at commercial use via an inflatable raft—a 1952 mining expedition by "[t]wo amateur geologists" along the Shungnak River, hundreds of miles away in northwest Alaska.[110]

A few historical instances of people using a particular craft, here an inflatable raft, for a commercial purpose does not make that craft "customary" for that purpose because using an inflatable raft is not the "usual practice[]" associated with the commercial activity. Oxford English Dictionary.[111] It is not surprising that rafts were not customary modes of trade and travel because pre-statehood rafts were not manufactured or sold for use in commerce. Leading up to statehood, most rafts on the market would have been military surplus purchased for personal or recreational use because companies did not start to specifically design rafts for recreational river running until after statehood.[112] Consistent with this non-commercial manufacture and marketing, it is telling that the raft users in the State's only mining example were amateurs. And the fact that the State shows no other instance of rafts being used for mining or some other commerce between that instance and statehood—seven years later—shows that rafts never became customary for commerce. Where the design, manufacture, and marketing of a product is all non-

_____

[110] *Id.* at 63.

[111] Greenwald Report i (citation omitted).

[112] *Id.* at 33. As explained below, the United States believes that modern inflatable, when compared to statehood era rafts, fail the Supreme Court's requirement that "the party seeking to use present-day evidence for title purposes must show: (1) the watercraft are meaningfully similar to those in customary use for trade and travel at the time of statehood." *PPL*, 565 U.S. at 601. The State has not made this showing, and it will be a disputed issue of fact whether modern inflatable rafts are materially similar to any watercraft this court rules are appropriate for the "susceptibility" analysis, the United States maintains that they are not.

commercial, the fact that a few people use that product for commercial purposes does not make it "customary" for that commercial purpose.

        b.     *Canoes were "the craft of the explorer," and they later became recreational craft, but they were not a customary mode of trade and travel on water at statehood*

The State cannot prove that canoes customarily served commercial uses that, as a realistic matter, might have occurred at the time of statehood on the North Fork of the Fortymile River. The State's own evidence shows that canoes were used for "other purposes," and in any event the State's evidence is too old or lacking needed specificity.

First, the State's own evidence shows canoes were customarily used for purposes other than commerce. The State's expert opines that canoes were "the craft of the explorer"[113] and the "adventurer"[114] during the Gold Rush era, and were used for "expeditions."[115] Similarly, the United States' expert found only one example of canoe use in in the Fortymile basin, by a survey expedition in 1887-88.[116] As the time of statehood grew near, the State's expert opines that canoes were less common for exploration and instead "canoeists were increasingly numbered as recreationists."[117] Consistent with this observation, the State expert's only example of canoe use within the same decade as statehood is a recreational hunting trip along the Delta River.

---

[113] State Ex. 6 at 11, Dkt. 52-6 (citation omitted).
[114] *Id.* at 14
[115] *Id.* at 13.
[116] Greenwald Report 18.
[117] State Ex. 6 at 15.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH        44

Second, much of the State's evidence is infirm because it recounts historical use too far removed from the time of statehood to be relevant. Mem. 12 (remarking on the use of canoes in "pre-recorded history" and "[i]n the late nineteenth century"); State Ex. 6 at 7-14 (opining on the use of canoes "in the eighteenth century;" during expeditions in 1863, 1884, 1885, 1890-91, 1898, and 1899; during the "turn-of-the-century and early Twentieth century Alaska," and in 1928). This evidence does not speak to the critical question of whether *at the time of statehood*, canoes were a "customary mode" of trade and travel.

Third, the State's evidence is infirm because it does not seek to identify any particular canoe customary for trade and travel in the region. The State's expert admitted he did not consider at all what canoes were used in the Fortymile region—a necessary part of the "customary" analysis.[118] Given the variability in "canoes," this would be an important fact if the State sought to prove modern inflatable rafts are "meaningfully similar" to canoes customary for trade and travel on water at statehood. *See North Carolina by & through N.C. Dep't of Admin.*, 853 F.3d at 152 (considering whether a specific type of canoe could be useful for commerce on a river and determining it could not due to features of that canoe). But the parties need not reach this proof problem because the State's evidence shows canoes were not customary for trade and travel on water at statehood and, thus, as a matter of law, canoes cannot be considered in any susceptibility analysis.

---

[118] Rice Deposition 58:3-6, attached as Ex. T ("Rice Dep.").

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                45
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 54 of 69

c.    *Airboats in Alaska were used for recreation*

The State cannot prove that airboats customarily served commercial uses that, as a realistic matter, might have occurred at the time of statehood on the North Fork of the Fortymile River, because airboats are customarily used for personal recreation—not trade and travel—and they do not even need a waterbody to operate. As described by the State's expert, "airboats" were created when boaters "mounted an airplane engine and propeller to [the] hull [of a boat] and used the raised propeller to push the boat at high speeds."[119]

The State's evidence establishes that airboats were used for personal recreation at statehood, and not as customary means of trade and travel. The State provides examples of "modern" airboats used in Alaska outside the Fortymile region in the 1950s,[120] but they were advertised and used for personal recreational purposes.[121] In discovery, the State provided only one instance of attempted commercial use of an airboat in 1918, and admitted it was an "experimental" salmon transport.[122] This single "experimental" use, followed by no other use for commerce, demonstrates that airboats were not customary for trade and travel. Additionally, airboats are inappropriate for any susceptibility analyses because they do not require water to operate. *See* Rice at 35 (acknowledging

---

[119] Rice Report 34.
[120] The State's expert otherwise admits that airboats were "not as common in Alaska as they are in other parts of the country." *Id.* at 35. Lacking Alaska evidence, the State's expert relies incorrectly on airboat use in other areas like "Utah and Florida." *Id.* at 34-35.
[121] *Id.* at 35-38.
[122] Rice Dep. 103:23-104:1.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          46
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 55 of 69

airboats can operate not only in "very shallow water" but "sometimes even over wet vegetation"); *Gasquet v. Com. Union Ins. Co.*, 391 So. 2d 466, 469 (La. Ct. App. 1980) (noting air boat operated in tort case could travel not only on water, but on "mud and even wet grass").

        d.    *Jet boats were "new" in Alaska in the summer of 1959 and thus could not have been a customary mode of trade and travel at statehood in January 1959*

The State cannot prove that jet boats customarily served commercial uses that, as a realistic matter, might have occurred at the time of statehood on the North Fork of the Fortymile River. The evidence shows that jet boats were not even common in Alaska at the time of statehood, let alone customary for trade and travel on water. According to the State's expert, jet boats "used a motor equipped with an impeller-type drive rather than a propeller."[123] He claims they were developed "mostly in New Zealand in the 1950s" then "found a ready home in Alaska starting in the late 1950s."[124]

The State provides only one example of a jet boat in Alaska before statehood, but that boat could not operate on rivers, and the State's other evidence shows jet boats were otherwise "new" after statehood. The State's expert opines that a "commercial version of a jet boat" was used in fisheries at Cordova in May 1958, but the expert admitted that was "not a river-going boat."[125] His other evidence makes clear that jet boats were still in their testing and development stages as of 1957 or 1958. *See Id.* Putting the last nail in the

---

[123] Rice Report 42.
[124] *Id.*
[125] *Id*. at 43

coffin on jet boats as "customary" at statehood, his report contains advertisements that

describe jet boat as new in Alaska in the summer of 1959 and in 1960—*after* Alaska

became a state.[126] The advertisements announce they are "Introducing [an] astounding

new <u>propeller-less</u> boat!!" that "advances boating into the jet-age!!!"[127] It goes on to

explain the jet boat "opens up brand new horizons for boating fun. Waters (rivers and

rapids included) heretofore considered too shallow or too swift now can be navigated!"[128]

Indeed, this advertisement makes clear that jet boats were precisely what the Supreme

Court directs courts to exclude from a susceptibility analysis. *See PPL*, 565 U.S. at 601

("If modern watercraft permit navigability where the historical watercraft would not . . .

then the evidence of present-day use has little or no bearing on navigability at

statehood.").

   At best, Alaska has shown that jet boats were "known" to some people in Alaska

at the time of statehood.[129] But that is not the test. The State's own evidence proves that

jet boats were not even common, and certainly not "customary modes of trade and travel"

at statehood.

   e.   *Outboard motor lifts were not customary means of
        trade and travel at statehood*

   The State cannot prove that outboard-motor lifts, referred to as "jackass lifts,"

customarily served commercial uses that, as a realistic matter, might have occurred at the

---

[126] *Id*. at 43-45.
[127] *Id.* at 45.
[128] *Id.*
[129] *Id*. at 43.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH          48

time of statehood on the North Fork of the Fortymile River because these unique devices were used for recreation and adventure seeking but they were not customary on boats using rivers as highways of commerce. Indeed, the State has presented no evidence that motorized boats with lift devices were used for any commercial purpose.

The State's evidence of motorized boats modified with lifts also fails to show these modifications were customary in the Fortymile basin.[130] Instead, the State provides a handful of examples of their use "near Fairbanks,"[131] on "the Kobuk River,"[132] and on "the Middle Fork of the Gulkana River."[133] And, even then, only for personal, non-commercial uses.

## II. The State's Motion for Summary Judgment Should Be Denied for Several Additional Reasons.

### A. Even if the post-statehood floats down the disputed reach were considered uses of the river "as a highway of commerce," modern rafts are not meaningfully similar to pre-statehood rafts and the State has failed to prove these same uses could have occurred at statehood.

In addition to the reasons downstream-only floating using inflatable rafts and canoes cannot prove navigability as a matter of law, the State's Motion for Summary Judgment fails because—as a matter of fact—modern inflatable rafts are different from statehood watercraft in meaningful ways. *See PPL*, 565 U.S. at 600 (to be considered "the

---

[130] There is evidence of small, handmade boats used by miners within the Fortymile River basin without motors, but the evidence of their use is too far removed from the time of statehood and their characteristics too varied to be part of any analysis aimed at determining whether these amorphously defined "small boats" constitute a common or "customary" form at the time of statehood that is helpful in the Court's analysis.
[131] Rice Report 31.
[132] *Id.*
[133] *Id.* at 33.

State of Alaska v. United States of America

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                                    49

Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 58 of 69

watercraft must be meaningfully similar to those in customary use for trade and travel at the time of statehood"). Again, the United States does not dispute that modern inflatable rafts can float (or, more accurately, float-drag) down the disputed reach, which is a beautiful, wild, and scenic reach. But in order to rely on this modern use as evidence that the reach was susceptible to navigation at statehood, the State must, "[a]t a minimum, . . . show: (1) the watercraft are meaningfully similar to those in customary use for trade and travel at the time of statehood; and (2) the river's poststatehood condition is not materially different from its physical condition at statehood." *PPL*, 565 U.S. at 601 (citing *Oregon*, 295 U.S. 1). The State cannot make the necessary showing.

The U.S. Navy's Head of the In Service Systems Engineering Branch of the Boat and Combatant Craft Division, Naval Surface Warfare Center[134] will testify that modern inflatable rafts are different from statehood watercraft in ways that are meaningful for the intended use and environment. He will opine that the 14-foot inflatable raft used as the State's "criteria craft" in its recreational rafting assessment is different from statehood-era military surplus rafts in meaningful ways, given the intended use (downstream floating) and environment (the reach). The Navy expert reported the following[135] similarities and differences between modern rafts and statehood-era rafts:

- Modern rafts are comparable in overall size (length and width) as statehood-era military surplus rafts.

- Modern rafts have comparable capacity or load capability as statehood-era military surplus rafts.

---

[134] *See* Marshall Curriculum Vitae, attached as Ex. V.
[135] Marshall Rebuttal Report 4-5, attached as Ex. U ("Marshall Report").

- Modern rafts are significantly lighter (about one-third the weight) than statehood-era military surplus rafts.

- Modern rafts have significantly less static draft (about half the static draft) than statehood-era military surplus rafts.

- Modern rafts are significantly more maneuverable than statehood-era military surplus rafts due to the surplus rafts' asymmetrical, tapered shape towards the stern (back), differences in the amount of stern rise, and the presence of appendages on the tube and some statehood-era raft bottoms.

- Modern rafts are made from inflatable fabrics that have significant improvements to durability and damage tolerance compared to statehood-era military surplus rafts.

These differences are not merely theoretical, and the impact of those differences is exemplified by the experience of Bartlett and his clients on the disputed reach. Bartlett testified that he arranged for four sets of clients to float the North Fork above Champion Creek in modern rafts that he specially designed for floating marginal waterways.[136] The clients made it down the river, but the many raft drags they experienced were so arduous that he received many complaints and no repeat customers.[137] Thereafter, he designed a second generation inflatable raft with large-diameter tubes to ensure less draft, designed the rafts with especially large tubes at the bow and stern to reduce draft where cargo weight would be concentrated, and had the raft manufactured from PVC materials so it could be dragged over the reach's rocks and riverbed with less friction than rubber materials.[138] After Bartlett started putting clients on the segment in his new rafts, the

---

[136] *See supra*, Background Part II.D.
[137] *Id.*
[138] *Id.*

floating improved so much that the route became his most popular.[139] He considers the new specialized raft essential to the success of this route and would not put clients on the river in anything else.[140]

The State has produced no credible evidence to contradict the meaningful differences between modern inflatable rafts and statehood watercraft. Indeed, the State's own recreational rafting witness mocked the Navy expert for saying modern rafts draft less due to larger-diameter tubes,[141] but when asked why Bartlett's redesigned rafts draft less than his prior raft design, the State witness opined the tube diameter was "likely the biggest explanation."[142] Beyond that, the State presents testimony from a second recreation planner who reported that he used a military surplus raft on the Colorado River and other rivers about fifty years ago and he thinks it worked just fine.[143] But when asked about the types of details that the Navy expert analyzed the witness only raised questions, and when asked if he knew the draft of the military surplus raft he used he replied "I don't know," before speculating.[144] He only used the surplus raft in a shallow environment on one or two occasions,[145] and has never rafted the North Fork. Indeed, when asked to explain why different craft drafted different amounts in his own report, the

---

[139] *Id.*
[140] Bartlett Dec. ¶ 22; Bartlett Dep. 70:16-72:9.
[141] Whittaker & Shelby Rebuttal to Marshall 6, attached as Ex. W ("Whittaker & Shelby Rebuttal").
[142] Whittaker Deposition 96:9-24, attached as Ex. X ("Whittaker Dep.").
[143] Shelby Deposition 17:9-19:12, attached as Ex. Y ("Shelby Dep.").
[144] Shelby Dep. 67:7-8, 83:3-18; *see also id.* 32:1-8 (testifying that he did not measure drafts of military surplus rafts he used because "[t]hat was 50 years ago before I ever knew I was going to be involved in a navigability case").
[145] Shelby Dep. 146:3-15 (recalling one drag by a large modified pontoon raft).

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH            52

witness could not.[146] This is not surprising since both of the State's "boatability"

witnesses are recreation planners who can testify about how fun it is to float rivers in

modern rafts, but are not qualified to testify about matters of marine engineering, boat

design, physics, materials, or anything else relevant to the question at hand.[147] Given the

overwhelming weight of the evidence to the contrary, the State will not be able to show

modern rafts are meaningfully similar to statehood watercraft.

Even less credible is the State's claim that modern inflatable rafts are

meaningfully similar to *anything* that drafts less-than 8 or 16 inches. The draft of a

watercraft alone is too simplistic to determine whether it is "meaningfully similar" to

another craft. A watercraft's design and materials impact how useful it will be under

various river conditions.[148]

### B. Even if "mere depth" were sufficient to prove a river is navigable under the equal footing doctrine, there is a dispute about the available channel depth and the drafts of watercraft

Even if the Court rules proof of depth is sufficient to demonstrate susceptibility to

navigation under the equal footing doctrine, which it should not, *see supra* Part I.B.,

summary judgment is inappropriate because the usable depth of the disputed reach is in

dispute. Functionally, the river is not as deep as the State claims because the boulders and

---

[146] Shelby Dep. 48:11-49:23; *see also* Whittaker Dep. 96:9-101:2.

[147] Shelby Dep. 17:9-19:12; Whittaker Dep. 14:6-18:5.

[148] *See* Marshall Deposition 186:11-187:1 ("I looked at the criteria craft that [the State recreational rafting witnesses] selected and said, What's the most similar thing commonly used that was available? . . . So when I look at a 14-foot self-bailing whitewater raft, and in [the State's recreational rafting witness's report] they talked about a 20-foot pulling [sic] boat. Well, those aren't similar. If you prove this can do it doesn't mean that thing can do it, right?"), attached as Ex. Z ("Marshall Dep.").

riffles that reduce the channel and require dragging are not reflected in either party's data. Witnesses for the United States have explained this in depositions, and will explain further at trial if needed. Additionally, people who have floated the disputed reach have reported dragging their low-draft rafts and striking boulders, which belies the State's claims that the modern inflatable rafts require only a clear 8 inch channel and that such a channel exists.



Figure 2. Plots of flow depth showing 8-inch and 16-inch depth (blue-two tone) thresholds based on TTI model results, with TTI's plot of the same data (yellow-red spectrum).

Figure 6.    Boulder riffle at the upstream end of Study Site NF1. (Photo by D. Thomas, July 23, 2020, Measured local discharge ~ 220 cfs; 59% exceedance flow).

Above is the State's graphic of the U.S. hydrologists data (left) and a photo of part of the reach of the U.S. hydrologist's report (right). The State asserts that its two-tone graphic of the data shows that there is a clear, contiguous 8-inch channel even at relatively low flows. Mem. 39-40. The photo does not and cannot show the depth of the river, but it is an example of one area in the reach with plainly observable riffles that span the entire width of the reach.[149] This is significant because, as the U.S. hydrologist explained, the data used by the State models the bathymetry of the riverbed *without the*

---

[149] Mussetter Report 21. Notably, the photo was taken at a higher flow than the State's graphic purports to represent. *See id.*

*boulders and riffles* that restrict and reduce the channel.[150] Although the State persists in offering the above graphic, its own hydrologist opined that—if the U.S. hydrologist was correct about what his data showed and did not show—then "the modeling is not depicting the river as it exists."[151] What's more, the State cannot provide any measurements from areas with riffles because the equipment the State used requires calm unobstructed water in order for the State to take accurate measurements.[152] The only reliable representation of the available depth comes from the experiences of actual floaters, and those experiences show that the channel is often less-than the draft of modern inflatable rafts.

Even low-draft modern inflatable rafts consistently must be dragged through parts of the disputed reach, in addition to striking and otherwise getting hung up on boulders. These experiences have been recorded since the first known trip on the disputed reach. BLM field notes from August 1987 record in the first 7.5 miles: "Rain. Lots of rock gardens to drag the raft through. This is to remind us that we are being paid to work, not play!"[153] After traveling 11.8 miles down the disputed reach, the notes report that the party continued to drag their raft after Butte Creek and until Champion Creek, although the "[r]ock gardens became much less frequent and drags shorter" over that span.[154] This

---

[150] Mussetter Deposition 274:6-276-7, attached as Ex. AA ("Mussetter Dep.").
[151] Fuller Dep. 195:5-197:4.
[152] USGS, *Measuring Discharge with Acoustic Doppler Current Profilers from a Moving Boat*, Chapter 22 of Book 3, Section A, at 16, US0049309, attached as Ex. AB; Mussetter Dep. 287:21-289:3.
[153] Aug. 1987 Notes at 5.
[154] *Id.* at 6.

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    55
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 64 of 69

was also the experience of Bartlett and his clients. And it has been the experience of the people who floated the reach related to this litigation.[155] One of the State's recreational rafting witnesses reported in August 2019 that he floated the disputed reach in a modern 14-foot inflatable raft with a 900-pound load, and he reported hitting obstructions 107 times without coming to a stop, hitting obstructions that brought him to a stop on 5 occasions, and 2 instances where he needed to drag his raft.[156] According to the same expert, a 14-foot self-bailing raft with a 900-pound load should draft less-than 5.5 inches.[157] The consistent experience of people floating the disputed reach shows it does not have a clear 8-to-16 inch channel.

The State's claim that a variety of non-motorized and motorized boats can usefully operate in waters from 8-to-16 inches deep also fails because, at best, the state relies on static drafts that are inadequate in a dynamic river environment. The U.S. Navy expert and U.S. expert hydrologist will both opine that the static draft measurements on which the State relies are inadequate to show the channel and depths required to use those craft in the reach at issue.[158] They will also opine that the State's claim that draft can be

---

[155] *See* Cooper Dep. 49:23-50:21; Frost Dep. 108:7-111:20 (testifying that he used a light load on the disputed reach but still dragged his raft); Frost July 2018 Field Notes, Ex. M p. 2-6 (noting over 20 drags on disputed reach). It is worth noting Mr. Frost's measurements recording channel depths in Exhibit 2 to his deposition do not reflect the depths available for a boat to pass through the channel because he measured the depth of the riverbed between boulders, even when the bottom of his raft was scraping boulders. Frost Dep. 179:15-182:21.

[156] Whittaker & Shelby Report 29.

[157] *Id.* at 21.

[158] Marshall Report 5, 18-19; Mussetter Report 148 ("When operating on an actual river, particularly in rough water such as a . . . significant riffle, the action of the boat can cause the bottom to dip up to several inches below those in quiet water."). The State's

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                    56

decreased when boats are "on step" fails to account for river conditions that could require a boat to come off of step, like avoiding boulders and riffles, and that boats would then require *even more depth* to try to get back on step.[159] In addition to having a larger draft than represented by the State, both experts will also opine that no operator can exclusively boat the deepest channel; boaters must intentionally leave the deepest channel to avoid obstructions at times, and where boaters are using less-maneuverable statehood era rafts they are more likely to leave the deepest channel unintentionally.[160]

Additionally, the State's theory of navigability appears to assume a river is susceptible for navigation in low-draft craft even if the hypothetical operator would need to regularly drag those craft (meaning channel depth must be less-than-or-equal-to the required operating draft). Mem. 20-21, 63-64. Although this is not the law, *see supra* Argument Part I.B., even if it were the U.S. Navy expert and even Bartlett's experience on the relevant reach demonstrate that materials matter on the relevant reach where floaters will hit rocks and need to drag their craft.[161] Although it still does not make a watercourse navigable, modern materials facilitate dragging through increased durability

<hr />

recreational rafting witnesses submitted a purported "rebuttal" to the U.S. expert hydrologist. That report should be excluded as going well beyond the scope of the initial report, but to the extent it is not excluded the U.S. hydrologist can explain how the State's purported "rebuttal" is incorrect about draft and operating requirements on the relevant reach.

[159] Mussetter Dep. 141:13-142:12.

[160] Marshall Report 5.

[161] *Id.*

*State of Alaska v. United States of America*
Case No. 3:18-cv-00265-HRH                 57
Case 3:18-cv-00265-HRH   Document 55-1   Filed 11/14/22   Page 66 of 69

to make the craft last longer and by reducing friction with bed materials to ease some drags that were previously too arduous.[162]

**C.     The fact that other rivers in Alaska or other segments of this river have been considered navigable by federal employees, adjudicated navigable by the Interior Board of Land Appeals, or disclaimed, does not change the law or make this river segment navigable**

The State spends more pages discussing other rivers not in dispute than it spends discussing the "limited use" of the sixteen-mile reach at issue in this case. Mem. 43-56. The evidence here does not support a finding that the reach is navigable under the equal footing doctrine, so the State is forced to point to other rivers and claim it thinks they are pretty much the same. This emphasizes the weakness of the State's case for the river at issue, but is otherwise of no value. Courts have repeatedly ruled that comparisons to other rivers do not aid in assessing navigability. *E.g.*, *Utah*, 283 U.S. at 87 (rejecting "attempts to invite[] a comparison" with other rivers because "[e]ach determination as to navigability must stand on its own facts"). This rule is even more true where, as here, the State is relying not on court decisions but on disclaimers from the United States that cannot change the law of navigability under the equal footing doctrine (as is the case with the Gulkana, Mosquito Fork, and Middle Fork), or on recommendations from BLM employees that cannot even bind the United States (as is the case with the Dennison Fork). To the extent these disclaimers and recommendations show anything, they show the level of confidence with which the United States believes the disputed reach is not navigable under the equal footing doctrine.

---

[162] Bartlett Dec. ¶¶ 11-13, 17, 19-22.

## CONCLUSION

Wherefore, the United States of America respectfully requests the Court grant its

Partial Motion for Summary Judgment and deny Alaska's Motion.

Dated: November 14, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/* Thomas W. Ports, Jr.
Thomas W. Ports, Jr.
Shannon Boylan
150 M Street, N.E.
Washington, DC  20004
Telephone:    (202) 305-0503
Fax:             (202) 305-0506
Email: thomas.ports.jr@usdoj.gov
           shannon.boylan@usdoj.gov
*Counsel for the United States of America*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Order at Dkt. No. 54, I hereby certify that this memorandum complies with the word limitations set in that Order because this memorandum contains 16,257 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word 2016 (16.0.5161.1000) MSO (16.0.5173.1000) 32-bit.

/s/ Thomas W. Ports, Jr
   Thomas W. Ports, Jr.

**<u>Certificate of Service</u>**

I certify that on **November 14, 2022** the foregoing, **United States of America's Memorandum in Support of its Opposition to and Cross-motion for Summary Judgment** were served via the court's CM/ECF system, which electronically served all parties.

/s/ Thomas W. Ports, Jr.
Thomas W. Ports, Jr.