# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Defendant. | Case No. 3:18-cv-00265-SLG |

## ORDER RE MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 51 is Plaintiff State of Alaska's Motion for Summary Judgment.[1] Defendant United States of America filed a Cross-Motion for Summary Judgment and Opposition to the State's Motion for Summary Judgment at Docket 55.[2] The State filed a combined Reply in Support of Its Motion for Summary Judgment and a Response in Opposition to the United States' Cross-Motion for Partial Summary Judgment at Docket 56. The United States replied to the State's response at Docket 63. The State requested oral argument, but oral argument was not necessary for the Court's determination.

## BACKGROUND

The Fortymile River and its branching forks and creeks are located 180 miles

---

[1] *See also* Docket 52 (Mem. of Points and Authorities in Supp. of Pl.'s Mot. for Summ. J.).

[2] *See also* Docket 55-1 (United States of America's Mem. in Supp. of Its Opp'n to and Cross-Mot. for Summ. J.).

east of Fairbanks, Alaska, near the Alaska-Canada border.[3]  The State brought this action pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, seeking to quiet title to submerged lands underlying the Fortymile River.  Although much of the parties' initial dispute has since been resolved, the uppermost 16 miles of the North Fork of the Fortymile River remains in dispute ("Disputed North Fork").[4]

Disputed North Fork starts at the North Fork headwaters where Independence Creek and Slate Creek merge (river mile 59.3) and extends three-tenths of a river mile downstream from where Champion Creek meets North Fork (river mile 42.4).[5]  Starting at the headwaters, Disputed North Fork is a single channel with boulder riffles for the first ten miles.[6]  Over the next six miles, Disputed North Fork widens, splits in places, and has wide gravel bars.[7]  Along its course,

---

[3] Docket 52-1 at 2 (map of the region); Docket 52-2 at 2 (2018 Bureau of Land Management ("BLM") report).

[4] Docket 1 at ¶¶ 15-17, 36 (Compl.); Docket 1-2 (map); Docket 52-13 at 3-4; Docket 55-5 at 14. In its complaint, the State also sought to quiet title to the Middle Fork of the Fortymile River and a portion of North Fork from its headwaters to a feature called the Kink.  Docket 1 at ¶¶ 14-15. "The Kink was formed in 1898 when a group of Danish prospectors blasted away a 100-foot rock ridge to drain a 2.8-mile-long meander."  Docket 52-1 at 1.  However, the United States has since disclaimed the submerged lands under Middle Fork and the submerged lands under North Fork from just below where Champion Creek meets the North Fork to the Kink.  Docket 48 at 1-2.  Accordingly, title remains disputed in this action only as to North Fork from its headwaters to 0.3 miles downstream from where Champion Creek meets North Fork.  *See* Docket 52 at 8-9; Docket 55-1 at 21, 23, 33-34.

[5] *See* Docket 52 at 8-9; Docket 55-1 at 21, 23, 33-34; Docket 48 at 2 (noting that "0.3 rivermiles downstream of the south bank of Champion Creek where that bank meets the North Fork" is "approximately river mile 42.4").

[6] Docket 55-5 at 10, 14; Docket 52-21 at 25 (United States' expert hydrologist's description); Docket 52-18 at 3 (State's expert hydrologist's description).

[7] Docket 55-5 at 10; Docket 52-18 at 3.  *See* Docket 55-5 at 19 (photo of portion of Disputed North Fork).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 2 of 39

several tributaries join Disputed North Fork, including Champion Creek at river mile 42.7.[8]  Champion Creek contributes nearly one-quarter of Disputed North Fork's total watershed.[9]  Disputed North Fork ends three-tenths of a mile downstream from its confluence with Champion Creek.[10]

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action with claims arising under federal law: the Quiet Title Act, 28 U.S.C. § 2409a.

## LEGAL STANDARDS

### I.    Summary Judgment

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The burden of showing the absence of a genuine dispute of material fact lies with the movant.[11] If the movant meets this burden, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial."[12]  The non-moving party may

---

[8] Docket 55-5 at 14-15; Docket 52-18 at 2.

[9] Docket 52-18 at 2.

[10] Docket 48 at 2.

[11] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[12] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 3 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 3 of 39

not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable [trier of fact] could return a verdict for the non-moving party."[13]   In reviewing cross-motions for summary judgment, a court "review[s] each separately, giving the non-movant for each motion the benefit of all reasonable inferences."[14]

## II.   Equal Footing Doctrine and Submerged Lands Act

Determining title to Disputed North Fork implicates the navigability of that river at the time of Alaska's admission to the Union.   Under the Equal Footing Doctrine, newly admitted states are guaranteed "the same rights enjoyed by the original thirteen States and other previously-admitted States," including "title ownership to lands underlying navigable rivers."[15]  This guarantee was codified in the Submerged Lands Act of 1953 and extended to Alaska in the Alaska Statehood Act of 1958.[16]  Accordingly, Alaska acquired title to submerged lands underlying navigable waters[17] on January 3, 1959, when it became the 49th state of the

---

[13] *Anderson*, 477 U.S. at 248-49 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

[14] *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016) (citing *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008)).

[15] *Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1404 (9th Cir. 1989) (citing *Utah Div. of State Lands v. United States*, 482 U.S. 193, 196 (1987)).

[16] Submerged Lands Act, Pub. L. No. 83-31, § 3, 67 Stat. 29, 30-31 (1953) (codified at 43 U.S.C. § 1311(a)); Alaska Statehood Act, Pub. L. No. 85-508, § 6(m), 72 Stat. 339, 343 (1958).

[17] The United States could reserve certain lands beneath navigable waters before statehood for the United States, but such reservation is not an issue in this case.  *See Idaho v. United States*, 533 U.S. 262, 272-74 (2001).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 4 of 39

Union.[18]  "The United States retains any title vested in it before statehood to any land beneath waters not then navigable . . . ."[19]

To determine navigability, courts apply the standard established in 1871 by the Supreme Court in *The Daniel Ball*:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact.  And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.[20]

"Navigability must be assessed as of the time of statehood, and it concerns the river's usefulness for 'trade and travel,' rather than for other purposes."[21]  "Mere use by initial explorers or trappers, who may have dragged their boats in or alongside the river despite its nonnavigability in order to avoid getting lost, or to provide water for their horses and themselves, is not itself enough."[22]

## DISCUSSION

### I.   United States' Cross-Motion for Summary Judgment

The Court first addresses the United States' Cross-Motion for Partial Summary Judgment because the legal determinations the United States seeks could impact the Court's determination as to whether the State is entitled to

---

[18] *Alaska v. United States*, 201 F.3d 1154, 1156 (9th Cir. 2000).

[19] *PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012) (citation omitted).

[20] *Id.* at 591-92 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1871)).

[21] *Id.* at 600 (citing *United States v. Utah*, 283 U.S. 64, 75-76 (1931)).

[22] *Id.* (citing *United States v. Oregon*, 295 U.S. 1, 20-21 (1935)).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 5 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 5 of 39

summary judgment. The United States asks the Court to make three legal rulings: (a) "Susceptibility to downstream-only floating for recreation and government purposes is legally insufficient to make a river navigable in fact";[23] (b) "Mere depth of water is legally insufficient to make a river navigable in fact";[24] and (c) "Watercraft considered in any susceptibility analysis must have been the 'modes of trade and travel on water' that were 'customary' at statehood."[25]

### a. Downstream-Only Floating

First, the United States seeks a legal determination that susceptibility to downstream-only floating for recreation and government purposes is, as a matter of law, legally insufficient for navigability.[26] The United States relies on language in *The Daniel Ball* requiring that a waterway be susceptible to use as a "highway for commerce" and argues that downstream-only floating for recreation or government purposes "do[es] not use the river as a 'highway' of commerce, [is] not transportation on water for profit, and do[es] not show the river is one of general and common usefulness for purposes of trade and commerce."[27]

---

[23] Docket 55-1 at 37.

[24] Docket 55-1 at 41 (internal quotation marks omitted).

[25] Docket 55-1 at 43. The United States also asks for a ruling that "the undisputed facts show inflatable rafts, canoes, airboats, and jet boats were not customary modes of trade and travel at statehood." Docket 63 at 8. The Court addresses this request in its consideration of the State's Motion for Summary Judgment. *See infra* Section II.a.

[26] Docket 55-1 at 37-41.

[27] Docket 55-1 at 37.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 6 of 39

The Court declines to find that susceptibility to downstream-only floating for recreation or government purposes is insufficient for navigability as a matter of law; rather, precedent requires a case-by-case analysis. First, transportation for profit is not required for navigability. In *Utah v. United States*, the Supreme Court held that the Great Salt Lake was navigable when "nine boats [were] used from time to time to haul cattle and sheep from the mainland to one of the islands or from one of the islands to the mainland. The hauling apparently was done by the owners of the livestock, not by a carrier for the purpose of making money."[28] The federal government had argued that the ranchers' use of the lake did not render it "a navigable highway in the customary sense of the word" because "the business of the boats was ranching and not carrying water-borne freight."[29] The Supreme Court rejected this argument, holding that the noncommercial aspect of the ranchers' use was "an irrelevant detail" and that "[t]he lake was used as a highway."[30]

The United States contends that while *Utah* recognized that transportation for profit is not required for navigability, a waterway must still be susceptible to use as a highway to be legally navigable.[31] The Court agrees that the waterbody must

---

[28] 403 U.S. 9, 11 (1971).

[29] *Id*.

[30] *Id*.

[31] Docket 55-1 at 41 (first quoting *Ahtna, Inc.*, 891 F.2d at 1404; and then citing *Utah*, 403 U.S. at 11).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 7 of 39

be susceptible to use as a highway, but the Court disagrees with the United States'

contention that downstream-only use precludes a finding that a river is susceptible

to use as a highway. To the contrary, in *Oregon ex rel. Division of State Lands v.*

*Riverfront Protection Ass'n*, the Ninth Circuit held that a river was navigable based

on evidence of the downstream floating of thousands of logs.[32] The United States

maintains that *Riverfront Protection Ass'n* is distinguishable because the river in

that case had actually been used as a highway for commerce, so susceptibility to

use was not at issue, and "no court has ever found a river navigable under the

equal footing doctrine based on mere 'susceptibility' to log drives."[33] However, no

court has ever found that as a matter of law, a river is not navigable solely because

the only travel that could take place on it was downstream travel, and this court

declines to so hold.

The United States also asserts that *United States v. Oregon* stands for the

proposition that pleasure boating and hunting cannot support a finding of

navigability.[34] But in *Oregon*, the Supreme Court did not hold that the use of

---

[32] 672 F.2d 792, 795-96 (9th Cir. 1982); *see also* Docket 56 at 30 (State's Reply). *But see*
*United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899) ("The mere fact
that logs, poles, and rafts are floated down a stream occasionally and in times of high water
does not make it a navigable river.").

[33] Docket 55-1 at 47-48.

[34] Docket 55-1 at 38-39, 44-45 (first citing *Oregon*, 295 U.S. at 21; and then citing *N. Am.*
*Dredging Co. of Nev. v. Mintzer*, 245 F. 297, 300 (9th Cir. 1917) ("Mere depth of water, without
profitable utility, will not render a water course navigable in the legal sense, so as to subject it to
public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or
fishermen to float their skiffs or canoes. To be navigable, a water course must have a useful
capacity as a public highway of transportation.")).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 8 of 39

pleasure boats and trappers' boats could not ever establish navigability. Rather, the Court focused on the condition of the waterways that rendered the boating activities "sporadic and ineffective," not the fact that the use was recreational.[35]

Moreover, the Supreme Court has recognized that "[e]vidence of recreational use, depending on its nature, may bear upon susceptibility of commercial use at the time of statehood."[36] Likewise, in *Alaska v. Ahtna, Inc.*, the Ninth Circuit expressed that "[t]o deny that this use of the [Gulkana] River is commercial because it relates to the recreation industry is to employ too narrow a view of commercial activity."[37] Because "[n]avigability is a flexible concept" and the case law does not foreclose the possibility that susceptibility to downstream-only recreational or government travel could support a finding that a river has a "capacity for general and common usefulness for purposes of trade and commerce,"[38] the Court denies the United States' first requested legal determination.

---

[35] *Oregon*, 295 U.S. at 20-23 (recounting that trappers and duck hunters who used boats on waterways often had to pole their boats and drag them yards from shore before they would float, and finding that use was "sporadic and ineffective" and that "[t]he evidence, taken as a whole, clearly establishes the flat topography of the disputed area, the shallow water without defined banks, . . . the separation of areas covered by water of sufficient depth to float boats, the presence of . . . water vegetation, a dry season every year, and frequent dry years during which [two lakes] are almost entirely without water, and [the third lake] is reduced to a relatively few acres of disconnected ponds surrounded by mud").

[36] *PPL Mont., LLC*, 565 U.S. at 600-01 (citations omitted).

[37] *Ahtna, Inc.*, 891 F.2d at 1405.

[38] *Id.* (citation omitted); *Oregon*, 295 U.S. at 23 (citation omitted).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 9 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 9 of 39

### b. Mere Depth of Water

Next, the United States asks the Court to rule as a matter of law that a navigability determination cannot be made based solely on "mere depth of water."[39]  As the *Daniel Ball* test requires the consideration of more than water depth, the Court grants the United States' second request and finds that mere depth of water, without satisfaction of the *Daniel Ball* test, is legally insufficient to establish navigability.[40]

### c. Watercraft Requirements

Third, the United States requests a ruling requiring that any watercraft considered in a susceptibility analysis "must have been (1) used for trade and travel, meaning realistic commercial use, (2) customary for those purposes, (3) at the time of statehood."[41]

#### i. Used for Trade and Travel – Commercial Use

The United States asserts that "[c]ourts regularly find rivers non-navigable where there is evidence the river was boated in watercraft that are typical for 'other purposes,' rather than for useful commerce."[42]  In support, the United States cites

---

[39] Docket 55-1 at 41-43.

[40] *N. Am. Dredging Co.*, 245 F. at 300 ("Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense . . . ." (quoting *Harrison v. Fite*, 148 F. 781, 784 (8th Cir. 1906))).  The State agrees.  Docket 56 at 31 ("The State agrees with the United States that depth of a waterbody is not the sole consideration in the navigability-in-fact analysis.").

[41] Docket 55-1 at 43-44 (internal quotation marks omitted).

[42] Docket 55-1 at 44.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 10 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 10 of 39

*Oklahoma v. Texas*,[43] *North American Dredging Co. v. Mintzer*,[44] *United States. v. Rio Grande Dam & Irrigation Co.*,[45] and *United States v. Brewer-Elliot Oil & Gas Co.*[46]  The United States claims that "[t]he State . . . fails to show its proposed historic watercraft were used for 'commercial use that, as a realistic matter, might have occurred' on the disputed reach because the State cannot identify any commerce that reasonably could occur on the reach."[47]

However, under *The Daniel Ball*, the test for watercraft is whether it was a customary mode of trade or travel at statehood.  The State does not need to establish that the watercraft was used in commerce; rather, it is the waterway itself that the State must show is "susceptible of being used . . . as [a] highway[] for commerce."[48]  To the extent the United States asks the Court to depart from the language of *The Daniel Ball* to require the State to show that a customary mode of trade and travel was used in commerce at the time of statehood, the Court declines

---

[43] 258 U.S. 574, 589-91 (1922).

[44] 245 F. at 299.

[45] 174 U.S. 690, 698-99 (1899).

[46] 249 F. 609, 623 (W.D. Okla. 1918), *aff'd*, 270 F. 100 (8th Cir. 1920), *and aff'd*, 260 U.S. 77 (1922).

[47] Docket 55-1 at 45 (quoting *PPL Mont., LLC*, 565 U.S. at 600).

[48] *PPL Mont., LLC*, 565 U.S. at 592 (quoting *The Daniel Ball*, 77 U.S. at 563).  *See Alaska v. United States*, 662 F. Supp. 455, 464-65 (D. Alaska 1987) ("When determining the title navigability of a waterbody . . . a court need not specifically concern itself with when and how commerce has or could be conducted in the region surrounding the waterbody; rather the court need only inquire if the waterbody is susceptible to the most basic form of commercial use: the transportation of people or goods."), *aff'd sub nom. Alaska v. Ahtna, Inc.*, 891 F.2d 1401 (9th Cir. 1989).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 11 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 11 of 39

to do so.  In the Court's view, that approach would improperly conflate two distinct components of the *Daniel Ball* test: that a river was susceptible to use as a highway of commerce and that a customary watercraft was used for trade and travel.

The cases the United States relies on do not compel a different result.  In *Oklahoma*, the Supreme Court observed that "[b]oats with a sufficient draft to be of any service can ascend and descend only during periods of high water" and concluded that

> trade and travel neither do nor can move over that part of the river, in its natural and ordinary condition, according to the modes of trade and travel customary on water; in other words, that it is neither used, nor susceptible of being used, in its natural and ordinary condition as a highway for commerce.  Its characteristics are such that its use for transportation has been and must be exceptional, and confined to the irregular and short periods of temporary high water.[49]

Thus, the *Oklahoma* Court determined that the disputed river was non-navigable because it could only be used during irregular periods of high water.  *Oklahoma* does not distinguish between watercraft that were commercially used and watercraft used for a different purpose.

In *North American Dredging Co.*, the Ninth Circuit held that a channel was not navigable where "the channel in controversy and other sloughs intersecting the land have never been used or regarded as available for any kind of navigation, other than for duck boats or punts for hunting and fishing."[50]  To the extent the

---

[49] 258 U.S. at 589, 591.

[50] 245 F. at 299.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 12 of 39

United States is asserting that this language precludes any consideration of non-commercial watercraft in a navigability analysis, the Court disagrees.[51]  Rather, the Court reads the language as emphasizing that, to be navigable, a waterway must have a useful capacity as a highway for commerce.

The United States also quotes the following excerpt from *Rio Grande Dam & Irrigation Co.*: "It is not . . . every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture."[52]  The Court similarly reads this language not as a limitation on the types of watercraft that may be considered in a navigability analysis but as emphasizing that the mere fact that a particular boat can float on the waterway at high water does not render the waterway navigable; instead, the waterway must be susceptible to use as a highway for commerce.

Lastly, the United States asserts that *Brewer-Elliott Oil & Gas Co.* "[found a] river segment non-navigable because steamboats and 'naphtha[] launches' could not use the segment, even though non-commercial '[s]kiffs could be used at any time.'"[53]  However, there, the court determined that the river was non-navigable because

[t]he use of that portion of the river for transportation boats has been

_____

[51] Docket 55-1 at 44-45.

[52] Docket 55-1 at 45 (quoting 174 U.S. at 698-99 (internal quotation marks omitted)).

[53] Docket 55-1 at 45 (quoting *Brewer-Elliott Oil & Gas Co.*, 249 F. at 623).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 13 of 39

exceptional and necessarily on high water, was found impractical, and was abandoned. The rafting of logs or freight has been attended with difficulties precluding utility. There was no practical susceptibility to use as a highway of trade or travel.[54]

Thus, to the extent that the United States asks the Court to exclude from consideration customary modes of trade and travel at statehood that were not used in commerce, the Court declines to do so, as it would impermissibly narrow the navigability inquiry.[55]

### ii. Customary for Commercial Use

The United States next maintains that "[a]ny watercraft considered must have been 'customary' for the identified reasonable commercial use."[56] The Court agrees insofar as *The Daniel Ball* requires that any watercraft considered must be a "customary mode[] of trade and travel" at statehood.[57] But as discussed in the preceding section, the Court rejects the United States' assertion that the use must

---

[54] *Brewer-Elliott Oil & Gas Co.*, 249 F. at 623.

[55] *See PPL Mont., LLC*, 565 U.S. at 600-01 ("Evidence of recreational use, depending on its nature, may bear upon susceptibility of commercial use at the time of statehood." (first citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 416 (1940) ("[P]ersonal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation"); and then citing *Utah*, 283 U.S. at 82 (fact that actual use has "been more of a private nature than of a public, commercial sort . . . cannot be regarded as controlling"))); *Ahtna, Inc.*, 891 F.2d at 1405 (rejecting argument that recreational use does not support a finding of navigability as "[t]he test is whether the river was susceptible of being used as a highway for commerce at statehood, not whether it was actually so used"); *Alaska v. United States*, Case No. 3:12-cv-00114-SLG, 2016 WL 1948801, at *7 (D. Alaska May 3, 2016) (noting that party's "asserti[on] that only 'freighting' or commercial use could be considered as a matter of law" was "at odds with both Ninth Circuit and United States Supreme Court precedent, which expressly directs consideration of non-commercial use in determining navigability").

[56] Docket 55-1 at 48; Docket 63 at 27.

[57] 77 U.S. at 563.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 14 of 39

have been commercial.[58]

"Customary" has been defined as "commonly . . . used."[59]  Further, as the United States' proposed definition provides, customary refers to "usual practices associated with a particular . . . place."[60]  The Court agrees that some geographic boundaries should be applied in determining the customary mode of travel.  In its reply, the United States cites two out-of-circuit cases for the proposition that this Court should only consider boats that were customary in the Fortymile Region and not in other parts of Alaska.[61]  While those cases discuss canoes used by "communities of the region" and boats "designed for the shallow rivers of the northern plains," they do not define what constitutes a region, nor do they hold that it is impermissible for a court to consider boats that may not have been used in a certain region but that were used within the same state.[62]  Rather, given the vastness of the state and its small population at statehood, the Court will consider

---

[58] *See supra* Section I.c.i.

[59] *Customary*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/customary#dictionary-entry-1 (last visited Feb. 6, 2024).

[60] Docket 55-1 at 49 (quoting Oxford English Dictionary definition of "customary" from Docket 55-4 at 2, which the United States refers to as the Greenwald Report i).

[61] Docket 63 at 29-30 (first citing *North Carolina ex rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 152 (4th Cir. 2017), *as amended* (Apr. 18, 2017), *as amended* (May 3, 2017); and then citing *North Dakota ex rel. Bd. of Univ. & Sch. Lands v. United States*, 972 F.2d 235, 239 (8th Cir. 1992)).

[62] *See North Carolina*, 853 F.3d at 152; *North Dakota*, 972 F.2d at 239.  *See also Utah*, 403 U.S. at 12 (affirming finding that Salt Lake was navigable where facts showed "that the lake on January 4, 1896, [the date of statehood,] 'could have floated and afforded passage to large boats, barges and similar craft *currently in general use on inland navigable bodies of water in the United States'*" (emphasis added)); *supra* Section I.c.ii.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 15 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 15 of 39

evidence by either party of customary watercraft in use in the state of Alaska before or at statehood in determining navigability under *The Daniel Ball*.[63]

### iii. At Statehood

The United States contends that "[t]he consideration of historic watercraft for a susceptibility analysis must focus on watercraft at the time of statehood" and, therefore, any watercraft that became customary after statehood cannot be used to establish navigability.[64]  The Court agrees that watercraft that did not become customary until after statehood cannot, standing alone, establish navigability.[65] But the Court also finds that watercraft that were used before statehood—and that might have declined in use by 1959 but nonetheless had been a customary mode of trade and travel prior to statehood—can support a finding of navigability.[66]

\* \* \*

In sum, the Court grants the United States' Cross-Motion for Summary Judgment insofar as the Court finds that mere depth of water is insufficient to

---

[63] *See* Docket 63 at 28-31.

[64] Docket 55-1 at 50-51; Docket 63 at 31-32.

[65] *See PPL Mont., LLC*, 565 U.S. at 601.

[66] *See* Docket 56 at 26-27 (citing *PPL Mont., LLC*, 565 U.S. at 582-83, to note that the "Supreme Court considered the diaries of Lewis and Clark, written in 1805, when considering the navigability of the Great Falls of the Missouri River at Montana's statehood in 1889"); *Utah*, 403 U.S. at 12 ("Most of the history of actual water transportation, to be sure, took place on the lake in the 1880's, yet the findings of the Master are that the water conditions which obtained on January 4, 1896, still permitted navigation at that time."); *Utah*, 283 U.S. at 82 ("Much of [the] evidence as to actual navigation relates to the period after [statehood], but the evidence was properly received . . . as being relevant upon the issue of the susceptibility of the rivers to use as highways of commerce [at statehood].").

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 16 of 39

establish navigability as a matter of law; the United States' motion is otherwise denied. The Court will apply *The Daniel Ball* to determine whether Disputed North Fork was susceptible of being used as a highway for commerce by a customary mode of trade or travel at the time of statehood. Customary modes of trade and travel must have been commonly used in the state of Alaska prior to or at the time of statehood, but they need not have been used for commerce. Further, any differences between the Fortymile Region and the region in Alaska where a watercraft was used and any gap in time between the customary use of the watercraft prior to statehood and January 3, 1959, will be considered in the Court's evaluation of the weight of the parties' evidence on the navigability of Disputed North Fork.

## II.    State's Motion for Summary Judgment

As an initial matter, the Court rejects the State's argument that, since the "United States agrees that the [Disputed North Fork] is beautiful and boatable in modern inflatable rafts," the United States has "concede[d] . . . navigability-in-fact."[67] Relying on *Ahtna, Inc.*, the State claims that "the modern commercial river rafting industry is commerce and could have been conducted by the types of boats customarily in use in Alaska at statehood" and that Disputed North Fork "is susceptible to the same kind of industry that exists on the Gulkana River," the river

---

[67] Docket 56 at 9.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 17 of 39

at issue in *Ahtna, Inc.*[68]

After the Ninth Circuit's decision in *Ahtna, Inc.*, the Supreme Court instructed, in *PPL Montana*, that a party seeking to establish navigability based on present-day use "must show: (1) the watercraft are meaningfully similar to those in customary use for trade and travel at the time of statehood; and (2) the river's poststatehood condition is not materially different from its physical condition at statehood."[69]  While the parties agree that the second requirement is met—that Disputed North Fork is in the same material condition now as it was at statehood[70]—they dispute whether modern inflatable rafts are "meaningfully similar to those in customary use for trade and travel at the time of statehood."[71]  The Court declines to rely "upon the State's evidence of present-day recreational use, at least without further inquiry," as to do so would be "wrong as a matter of law."[72]  The Court therefore considers whether there are material factual disputes with respect to the remaining aspects of the *Daniel Ball* test: (a) which watercraft were customary modes of trade and travel at statehood, and (b) whether Disputed

---

[68] Docket 56 at 9 (citing *Ahtna, Inc.*, 891 F.2d at 1405).

[69] *PPL Mont., LLC*, 565 U.S. at 601 (citation omitted).

[70] Docket 52 at 60 ("There is no dispute that the [Disputed] North Fork . . . is in its ordinary condition, unchanged since statehood in any respect that would affect navigability." (first citing Docket 52-18 at 2; and then citing Docket 52-21 at 2)); Docket 55-1 at 35 ("The disputed reach of the North Fork is in the same 'ordinary and natural condition' as when Alaska became a state in 1959.").

[71] *PPL Mont., LLC*, 565 U.S. at 601 (citation omitted).  *See* Docket 55-1 at 58-62.

[72] *PPL Mont., LLC*, 565 U.S. at 603.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 18 of 39

North Fork was susceptible to use as a highway of commerce by those customary watercraft.[73]

### a.    Customary Modes of Trade and Travel

The State maintains that it is entitled to summary judgment because Disputed North Fork "has sufficient depths and widths to be functionally and reliably boatable by a variety of boats customarily used on Alaska's rivers at statehood."[74]  The State maintains that each of the following were customarily used in Alaska before or at statehood: poling boats, canoes, handmade wooden boats, inflatable rafts, motorboats, airboats, and jetboats; the Court addresses each in turn.[75]

### i.    Poling Boats

The only boat that the parties agree was customarily used in the Fortymile Region for trade and travel at the time of statehood was the poling boat.[76]

---

[73] *See id.* at 601.  The parties dispute whether there is evidence of actual travel on Disputed North Fork before or at statehood, so the State relies on Disputed North Fork's susceptibility to use for a navigability determination on summary judgment.  Docket 52 at 62-63.  *See* Docket 52-8 at 10 (State's expert report recounting that a group of prospectors traveled up North Fork past the Kink to Hutchinson Creek); Docket 52-7 at 12 (United States' expert found "no evidence of travel by water on the Middle Fork or [past the Kink on the] upper North Forth prior to or at the time of statehood"); Docket 52-9 at 2-3 (United States' expert rebuttal report explaining that the State misinterpreted the historical writings and that the prospectors did not travel to Hutchinson Creek by water; rather, they walked on foot).

[74] Docket 52 at 9.

[75] *See* Docket 52 at 11-12 & n.16; Docket 52-6.  The United States' expert agreed that, in addition to poling boats, Peterborough canoes and some motorized boats were customarily used for trade and travel on water in the Fortymile Region prior to or at the time of statehood. Docket 52-7 at 3, 20-23, 26-28.

[76] *See* Docket 56 at 10-11 (State asserting that consideration of poling boats alone

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 19 of 39

"Historically, pole boats were used in the Fortymile Region of Alaska before statehood."[77]  From the 1880s to the 1930s, poling boats were used to carry supplies to miners upstream on the Fortymile River and South Fork to Chicken, Alaska, and to Mosquito Fork.[78]  In the 1930s, poling boats were widely used throughout Alaska,[79] and, while boat travel in the Fortymile Region decreased at that time,[80] "[m]iners continued to use poling boats . . . into the 1940s."[81]  Accordingly, the Court finds that there is no dispute of material fact that poling boats were a customary mode of trade and travel in Alaska at the time of statehood.

### ii. Canoes

The State's expert recounted that, long before statehood, Alaska Natives used canoes and kayaks to hunt and transport harvested resources on Alaska's rivers.[82]  At the time of Russian exploration, Alaska Natives traveled on water to

---

demonstrates Disputed North Fork was navigable at statehood).

[77] Docket 52-2 at 7.

[78] *See* Docket 52-3 at 3-4 (recounting instances of miners using poling boats to transport supplies up the Fortymile River to Chicken, Alaska, and to travel down the South Fork, Mosquito Fork, and the main stem of the Fortymile River); Docket 52-6 at 17-18 (describing use of poling boats in the Fortymile Region and on the Fortymile River to prospect for gold in the 1880s and 1890s); Docket 52-7 at 12, 20-23 (United States' expert report acknowledging that poling boats were used in the Fortymile Region at the time of statehood).

[79] Docket 52-6 at 24-26.

[80] Docket 52-3 at 4.

[81] Docket 52-6 at 23.

[82] Docket 52-6 at 7-8.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 20 of 39

Russian trading posts to trade furs.[83] Two United States military personnel used canoes and boats crafted by Alaska Natives to explore Alaska in the mid-1880s.[84] And in the 1890s, another explorer used a "cottonwood dugout canoe" for an expedition.[85]

At the turn of the 20th century, "[t]he Peterborough Canoe Company built canoes especially for use in Alaska . . . and for use by government expeditions."[86] In 1914, Peterborough Canoe Company advertised freight canoes ranging from 17 to 19.5 feet long and capable of carrying 1,250 to 2,000 pounds with a 12-inch draft.[87] "[P]unctures by snags or rocks of thin cedar planking [were] not uncommon, but these [were] quickly and permanently repaired by strips carried for the purpose."[88] According to the State's expert, from the late 1800s to early 1900s, the United States Geological Survey ("USGS") used Peterborough canoes "on about 15,000 miles of the watercourses of Alaska."[89] In the Fortymile Region, government expeditions used the canoes in 1898 to survey the area, at one point "poling, lining, and dragging their boats against the swift current and shallow water

---

[83] Docket 52-6 at 8.

[84] Docket 52-6 at 10.

[85] Docket 52-6 at 11.

[86] Docket 52-6 at 12.

[87] Docket 52-6 at 12 & n.17.

[88] Docket 52-6 at 12.

[89] Docket 52-6 at 11-12.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 21 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 21 of 39

to the Snag River."[90]  However, "[a]s other types of river boats started to become more popular after World War II, canoeists were increasingly numbered as recreationists rather than prospectors, trappers, or freighters.  Still, recreational canoers would utilize canoes capable of carrying large loads . . . ."[91]

The United States' expert agreed that Alaska Natives used canoes to travel. For example, the expert noted that the Upper Tanana, an Athabascan group that lived in the Fortymile Region, used a smaller, lightweight canoe that could carry one to two people and limited cargo, and a larger skin boat that could carry a dozen people or an equal amount of cargo.[92]  Another Athabascan group, the Han, also used canoes in the Fortymile Region for fishing and to hunt caribou.[93]  There is one account of Alaska Natives, likely Han, in the early 1900s using a canoe to pole up the Yukon River.[94]

Based on the foregoing, the State maintains that the evidence is undisputed that canoes were a customary mode of trade and travel at the time of statehood.[95] The United States disagrees, arguing that the "State cannot prove that canoes customarily served commercial uses that, as a realistic matter, might have

---

[90] Docket 52-6 at 13.

[91] Docket 52-6 at 15.

[92] Docket 52-7 at 13.

[93] Docket 52-7 at 13, 16.

[94] Docket 52-7 at 17-18.

[95] Docket 52 at 64.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 22 of 39

occurred at the time of statehood on the North Fork of the Fortymile River."[96]
Canoes were not used commercially, the United States claims, but rather were
used by explorers and adventurers and for expeditions, and then later for
recreation.[97] And the United States asserts that the State's identified historical use
of canoes is "too far removed from the time of statehood to be relevant."[98] The
United States also contends that canoes cannot establish navigability because the
State did not "identify any particular canoe customary for trade and travel," which
would be relevant to show that canoes used in Alaska around the time of statehood
were comparable to modern inflatable rafts.[99]

As discussed above, the Court rejects the United States' assertion that a
customary mode of trade and travel must necessarily have been used for a
commercial use.[100] The United States also asserts that, in assessing navigability,
the Court should not consider evidence of historical canoe use dating from the
1800s through 1928 in Alaska because it is too dated.[101] But, as noted above, the
Court declines to rule, as a matter of law, that courts are prohibited from

---

[96] Docket 55-1 at 53.

[97] Docket 55-1 at 53.

[98] Docket 55-1 at 54 (citing Docket 52-6 at 7-14 which recounted canoe use in the 18th Century, late 1800s, early 1900s, and 1928).

[99] Docket 55-1 at 54.

[100] *See supra* Section I.c.i; *supra* note 55.

[101] Docket 55-1 at 54.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 23 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 23 of 39

considering such evidence.[102]  And, regarding the United States' contention that the State cannot use canoes to demonstrate navigability because the State did not identify a particular canoe for comparison to modern watercraft, if at trial the State chooses to rely on canoes and modern recreational use of Disputed North Fork to show navigability, the State can present evidence that one or more particular types of canoe customary at statehood are meaningfully similar to modern watercraft. Accordingly, the Court finds that there is no dispute of material fact that canoes were a customary mode of trade and travel in Alaska for purposes of determining navigability at statehood.

### iii. Handmade Wooden Boats

The State's expert noted that some miners built "simple river boats" out of "local trees" to "float down to the Klondike and Fortymile gold areas."[103]  According to the United States' expert, in the late 1800s, miners, prospectors, and explorers used handmade boats of "varied . . . length and draft" to travel up the Fortymile River, the South Fork of the Fortymile River, and to the confluence of the North and South Forks of the Fortymile River.[104]

The United States challenges the relevance of handmade wooden boats to the navigability analysis, claiming that "the evidence of their use is too far removed

---

[102] *See supra* note 66.

[103] Docket 52-6 at 16.

[104] Docket 52-7 at 23-26.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 24 of 39

from the time of statehood and their characteristics too varied to be part of any analysis aimed at determining whether these amorphously defined 'small boats' constitute a common or 'customary' form at the time of statehood."[105]  As noted above, the Court declines to exclude evidence of customary modes of trade and travel as a matter of law simply because the evidence of their use is allegedly too dated.  However, the Court finds that a dispute of material fact exists as to whether handmade wooden boats were customary modes of trade and travel at the time of statehood.

### iv.      Inflatable Rafts

The State's expert opined that the use of inflatable rafts "increased significantly after World War II."[106]  A BLM employee, George Gustafson, indicated that inflatable boats were commonly used in Alaska in the 1940s and 1950s.[107]  Gustafson himself used an inflatable raft from 1949 or 1950 to 1955 that was 10 to 12 feet long and four feet wide for "week-long hunting trips, carrying over 1,000 pounds of people, moose meat, and supplies."[108]  Gustafson also recalled seeing a commercial river rafting trip on the Gulkana River in the early 1950s using military surplus inflatable boats.[109]     The State's expert also indicated that, before

---

[105] Docket 55-1 at 58 n.130.

[106] Docket 52-6 at 53, 57.

[107] Docket 52-6 at 59.

[108] Docket 52-6 at 59, 61.

[109] Docket 52-6 at 62.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 25 of 39

statehood, inflatable rafts were used by fishermen, a geographer, a prospector, hunters, and river guides on various Alaskan waterways.[110]    And, before statehood, two "amateur geologists" used an inflatable boat to mine a jade deposit on the Shungnak River.[111]  The report also recounted numerous advertisements for inflatable boats for sale in Alaska before statehood.[112]

The United States' expert opined that "[i]nflatable rafts were not customarily used in the Fortymile basin prior to or at the time of statehood," but acknowledges their use in other parts of the state at that time.[113]   Further, the United States maintains that "inflatable rafts were designed, sold, and used for 'other purposes' than commerce" and, citing the use of an inflatable raft by the amateur jade miners, that "[a] few historical instances of people using . . . an inflatable raft[] for a commercial purpose does not make that craft 'customary' for that purpose."[114]  But, as explained above, the Court does not find that customary use must have occurred in the Fortymile Region or been of a commercial nature.  The Court thus finds that there is no dispute of material fact that inflatable rafts were customary modes of trade and travel at statehood.

---

[110] Docket 52-6 at 60-62.

[111] Docket 52-6 at 68.  The United States notes that "the Shungnak River[ is] hundreds of miles away [from Disputed North Fork] in northwest Alaska."  Docket 55-1 at 52.

[112] Docket 52-6 at 66.

[113] Docket 55-4 at 36; Docket 52-7 at 33; Docket 52-9 at 8.

[114] Docket 55-1 at 51-52.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 26 of 39

### v. Motorboats

The State's expert chronicled that outboard motors, often attached to poling boats and other boats already in use, were used in Alaska by the early 1900s.[115] For example, in 1926, a USGS expedition used an outboard motor attached to a poling boat, and, in 1929, the government used a poling boat with an outboard motor to conduct a census along the Yukon River from Fairbanks to Nenana.[116] Starting in the 1930s, boaters began using lift mechanisms so they could lift the motor when in shallow water.[117] Inboard motors were used on boats with a tunnel design, which "used a recessed area at the stern of the hull to draw water up to the motor within the tunnel."[118] But tunnel boats with inboard motors were heavier than boats with outboard motors and "could get hung up on gravel bars or other obstructions," so "they were largely replaced by outboard riverboats and other, lighter types of boats."[119]

Eventually, Alaskan boaters began building watercraft specifically for use with outboard motors.[120] As the State's expert explained, "[b]y the 1950s, the

---

[115] Docket 52-6 at 26-27, 31 (explaining that outboard motors were attached to skiffs, dories, and umiaks).

[116] Docket 52-6 at 27-30 (providing additional examples of use of poling boats and canoes from the 1920s to the 1940s with outboard motors).

[117] Docket 52-6 at 37-38.

[118] Docket 52-6 at 43.

[119] Docket 52-6 at 46-47.

[120] Docket 52-6 at 35.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 27 of 39

typical Alaskan river boat was 5 to 6 feet in beam by 18 to 35 feet in length, with a flat bottom and no keel. . . . They were normally constructed out of wood, primarily Sitka spruce or plywood, but some were aluminum."[121]  Gustafson also indicated that these kinds of boats were very common in Alaska from the late 1940s to 1960s; he used one for his work for BLM during that time, and he saw companies use similar boats to transport clients for hunting and fishing trips.[122]  These boats were also used for recreation.[123]

> The United States' expert recounted that:
>
> Motorized boats were used in at least some portions of the Fortymile basin.  John Mertie, who traveled to Alaska in 1936 to do survey work for the USGS, reported that "[g]asoline launches and small boats are also used on the streams tributary to the Yukon River, particularly on the Fortymile River, where supplies are freighted from the mouth of the Fortymile upstream to Steel Creek."[124]

The United States' expert concluded that "motorized boats were customarily used for trade and travel on water in the region prior to or at the time of statehood," but found "no evidence that motorized boats were used on the Middle Fork or upper North Fork prior to or at the time of statehood."[125]  However, as discussed above,

---

[121] Docket 52-6 at 35.

[122] Docket 52-6 at 35-36.

[123] Docket 52-6 at 36.

[124] Docket 52-7 at 28.

[125] Docket 52-7 at 3, 28.  The United States notes that one "customary boat[] of gold miners" was the "propeller-powered riverboat[]."  Docket 63 at 30.  Accordingly, the United States appears to only challenge the Court's consideration of motorboats with lifts.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 28 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 28 of 39

the Court will consider evidence of customary use in the state of Alaska.[126]

The United States argues that outboard motor lifts were not customary means of trade and travel at statehood "because these unique devices were used for recreation and adventure seeking but they were not customary on boats using rivers as highways of commerce."[127]  However, as noted above, the Court finds that recreational use can be considered when determining whether a watercraft was used as a customary mode of trade and travel.[128]

Accordingly, the Court finds that there is no dispute of material fact that river boats with outboard motors, with or without lifts, were customary modes of trade and travel in Alaska at the time of statehood.

### vi.        Airboats

The State's expert described airboat use in Alaska, including "an experimental salmon transport consisting of a large scow fitted with an airplane engine and propeller on its stern" built in 1918 and a Peterborough canoe outfitted with an air propeller that was used to transport a village doctor and his spouse from Candle to Kelawik in the same year.[129]  In 1953, a group of Kotzebue hunters built an airboat for sealing and whaling, and, in 1958, a fishing and hunting

---

[126] *See supra* Section I.c.ii.

[127] Docket 55-1 at 57-58.

[128] *See supra* note 55.

[129] Docket 52-6 at 40-41.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 29 of 39

publication reported that the Salcha and Chena Rivers were so shallow that even airboats were returning from moose hunting with "trouble bound to the bottom."[130] In 1959, the Haines Sportsmen's Association offered a new airboat as a raffle prize, and the association hosted an airboat race.[131] Numerous advertisements in newspapers from Anchorage and Fairbanks listed airboats for sale in the late 1950s, and airboats were used on the Knik and Gulkana Rivers around the time of statehood.[132]

In her rebuttal to the State's report, the United States' expert noted that airboats were used on the Gulkana River starting in the mid-1950s to transport loads of 600 to 700 pounds.[133] But the expert opined that the airboats pictured in the State's expert report do not "appear to be designed or used to move freight."[134] However, a watercraft can demonstrate navigability even if it does not transport freight. The United States' expert also concluded that "neither jet boats nor airboats were customarily used in the Fortymile basin prior to or at the time of statehood."[135] However, as noted, the Court does not find that the *Daniel Ball* test requires that the customary mode of trade and travel be used in the precise region

---

[130] Docket 52-6 at 41 & n.121.

[131] Docket 52-6 at 41.

[132] Docket 52-6 at 42-43.

[133] Docket 52-9 at 7.

[134] Docket 52-9 at 7.

[135] Docket 52-9 at 7-8.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 30 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 30 of 39

at issue; rather, the Court will consider use in the state of Alaska.[136]  The United States also argues that airboats should not be considered in a navigability analysis because "airboats were used for personal recreation at statehood, and not as customary means of trade and travel," and that "they do not even need a waterbody to operate."[137]  As noted above, boats used for recreational purposes are not excludable as a matter of law in determining navigability,[138] and the Court is not persuaded that the fact that airboats can operate over wet vegetation precludes airboats' relevancy to a navigability analysis.[139]  Accordingly, the Court finds that there is no dispute of material fact that airboats were customary modes of trade and travel in Alaska at statehood.

### vii.      Jetboats

The United States maintains that, because jetboats were new in Alaska in 1959, they were not a customary mode of trade and travel.[140]  The State acknowledges that whether jet boats were in customary use at statehood is disputed.[141]  Accordingly, the Court finds that a dispute of material fact remains as

---

[136] *See supra* Section I.c.ii.

[137] Docket 55-1 at 55.

[138] *See supra* note 55.

[139] *See* Docket 55-1 at 55-56 (quoting the State's expert at Docket 55-20 at 5, which notes that "airboats can operate not only in 'very shallow water' but 'sometimes even over wet vegetation'").

[140] Docket 55-1 at 56.

[141] Docket 56 at 27 n.90.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 31 of 39

to whether jetboats were customary modes of trade and travel at the time of statehood.

* * *

In sum, the Court finds that the State has established that poling boats, canoes, inflatable rafts, motorized boats, and airboats were customary modes of trade and travel in Alaska at the time of statehood. But disputes of material fact remain as to whether handmade wooden boats and jetboats were customary modes of trade and travel in Alaska at the time of statehood.

### b.      Susceptible to Use as a Highway of Commerce

The State asserts that "the modern inflatable canoes and rafts used by witnesses who boated [Disputed] North Fork . . . are meaningfully similar to pre-statehood non-motorized boats, including pre-statehood canoes and poling boats," as "[a]ll of these craft draft 8 inches or less and require similar channel widths."[142] And the State maintains that Disputed North Fork is navigable because the United States' expert hydrologist reported that Disputed North Fork has "consistent depths greater than 8 inches even at relatively low water levels."[143] Accordingly, the State claims that navigability can be based on canoes, poling boats, and other non-

---

[142] Docket 52 at 64.

[143] Docket 52 at 64.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 32 of 39

motorized boats customarily in use at statehood, without consideration of motorized boats.[144]

The United States disputes the State's interpretation of the United States' hydrologist's data,[145] asserts that modern inflatable rafts are not meaningfully similar to any watercraft used at the time of statehood,[146] and maintains that draft alone is "too simplistic" a measure on which to base a finding of meaningful similarity.[147] The United States points to the deposition testimony of one of the State's experts, Larry Bartlett, who owns a wildlife adventure company and organizes hunting trips in the Fortymile Region.[148] He testified that his clients hike from the Gold Run landing strip to hunt on rafts starting above the North Fork headwaters and that, during periods of low water, his clients have had to drag their

---

[144] Docket 52 at 64.

[145] Docket 55-1 at 15 ("On depth of water, the State relies on measurements from only the deepest, least obstructed parts of the river and misuses the U.S. hydrologist's data to make it appear that a clear channel exists. The U.S. hydrologist already explained that the State's interpretation is incorrect."). *See* Docket 55-1 at 62-63 ("Functionally, the river is not as deep as the State claims because the boulders and riffles that reduce the channel and require dragging are not reflected in either party's data.); Docket 55-28 at 5-6 (United States' hydrologist explaining that "the boulders for the most part are not reflected in the mapping that this is based on" and that the State's graph does not "mean there is 8 inches of depth available for a boat to pass through").

[146] In its reply, the United States recognizes that "[a]lthough not all historic craft are customary modes of trade and travel on water appropriate for a susceptibility analysis, . . . the Court in this case should consider evidence of all river use when assessing susceptibility." Docket 63 at 25.

[147] Docket 55-1 at 59-60 (citing Docket 55-22 (expert report concluding that modern inflatable rafts are lighter, have less static draft, are more maneuverable, and are more durable than statehood military surplus inflatable rafts)).

[148] Docket 52-30 at 1-4.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 33 of 39

rafts from the start of their trip all the way to Champion Creek.[149]

A "party seeking to use present-day evidence for title purposes must show . . . the watercraft are meaningfully similar to those in customary use for trade and travel at the time of statehood."[150] "If modern watercraft permit navigability where the historical watercraft would not, . . . then the evidence of present-day use has little or no bearing on navigability at statehood."[151] "[T]he test focuses on the capabilities and draft of the vessels . . . ."[152]

Above, the Court found that poling boats, canoes, inflatable rafts, motorized boats, and airboats were customary modes of trade and travel on water in Alaska at statehood. Because the State seeks summary judgment on poling boats, canoes, and inflatable rafts alone,[153] the Court considers whether the State has shown that Disputed North Fork was susceptible to use as a highway of commerce at statehood by any of these three types of vessels.[154]

---

[149] Docket 52-30 at 18-21, 27 (Bartlett testifying that when groups "shot all of their harvest close to the put-in" they "drag for days to reach Champion [Creek]").

[150] *PPL Mont., LLC*, 565 U.S. at 601 (citation omitted).

[151] *Id.*

[152] *Alaska*, 2016 WL 1948801, at *7 n.82. The United States maintains that "technology that affects capabilities must be considered." Docket 63 at 21-22 (citing *PPL Mont., LLC*, 565 U.S. at 601-02). The Court agrees that technology may well affect a vessel's capabilities and is considered in that regard when assessing meaningful similarity.

[153] Docket 52 at 64.

[154] *See PPL Mont., LLC*, 565 U.S. at 600 (citation omitted).

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 34 of 39

### i. Poling Boats

The State's expert modeled draft and load for several kinds of modern non-motorized boats that "are suitable for trips on the . . . North Fork[]."[155]  The report included a figure that "provides schematic drawings of representative non-motorized boat types, widths and lengths, and associated clear channel needs. The figure also includes a light poling boat, an historical craft used in the Fortymile Basin, which has similar lengths, widths, and drafts."[156]  The figure appears to show that a pack raft, canoe, inflatable canoe, cataraft, inflatable raft, and 20-foot-long poling boat all draft less than 8 inches.[157]

The United States counters that the State's expert "did not examine the capabilities of poling boats or 'clearly compare' them to modern vessels.  The recreational rafting witnesses report simply provides a picture of its draft."[158]  Further, the United States' expert witness opined that a 14-foot self-bailing whitewater raft and a 20-foot poling boat are not similar.[159]

Viewing the evidence in the light most favorable to the United States, the Court finds that the State has not established that Disputed North Fork was susceptible to use as a highway for commerce by poling boats at statehood.  To

---

[155] Docket 52-13 at 22-23.

[156] Docket 52-13 at 25 (citing Docket 52-6).

[157] Docket 52-13 at 26.

[158] Docket 63 at 23 n.12 (citations omitted).

[159] Docket 55-27 at 2-3.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 35 of 39

begin, the State has not conclusively established that a poling boat would draft no more than eight inches, as it does not appear that the State's expert actually performed a draft analysis with a statehood-era poling boat. Nor does the expert explain how any of the modern boats the expert studied are meaningfully similar to a historic poling boat.[160] The expert's inclusion of a photo of a statehood-era poling boat, without more, does not establish that such a vessel could navigate Disputed North Fork.[161] Further, the State has not established that static draft alone is sufficient to show a watercraft could navigate a particular waterway.[162] In sum, disputes of material fact remain as to whether Disputed North Fork was susceptible to use as a highway of commerce at statehood by poling boats.

### ii.   Canoes

The State's expert opined that modern "[c]anoes and inflatable canoes with loads about 700 to 900 [pounds] draft" "less than 8 inches."[163] However, the expert did not explain how the modern canoes he considered are meaningfully similar to

---

[160] Docket 52-13 at 10-11. The State's expert concluded that "modern boats are more similar than different to their historical ancestors. Their overall dimensions are similar (lengths and widths); their displacements are similar (especially for loads far greater than the weight of the boat); and their designs are only subtly different. Most importantly, their drafts are similar (about 6 to 8 inches, depending on load). We therefore conclude that current-day craft are meaningfully similar to boats used on Alaskan rivers for trade and transportation about the time of statehood." Docket 52-13 at 28. The Court finds that this general conclusion is insufficient to establish that Disputed North Fork was navigable by a particular customary mode of trade and travel at statehood.

[161] *See* Docket 52-13 at 26.

[162] *See* Docket 63 at 22-23 n.11 (quoting Docket 52-6 at 16-17).

[163] Docket 52-13 at 24.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 36 of 39

canoes used at the time of statehood.[164]  As noted above, one Peterborough canoe used before statehood was 17 to 19-and-one-half feet in length, could carry 1,250 to 2,000 pounds, and drafted 12 inches.[165]  Viewing the evidence in the light most favorable to the United States, disputes of material fact remain as to whether Disputed North Fork was susceptible to use as a highway of commerce at statehood by canoes.

### iii.    Inflatable Rafts

The parties dispute the draft of inflatable rafts, with the State's expert reporting that modern inflatable rafts draft "less than 8 inches" and generally asserting that modern boats are similar to boats used in Alaska at the time of statehood.[166]  The United States' expert reported that military surplus inflatable rafts in use at statehood drafted 11 to 15 inches.[167]  Viewing the evidence in the light most favorable to the United States, disputes of material fact remain as to whether Disputed North Fork was susceptible to use as a highway of commerce at statehood by inflatable rafts.

### CONCLUSION

Accordingly, the United States' Cross-Motion for Summary Judgment at

---

[164] *See* Docket 52-13 at 11 (listing canoes used for draft demonstration, which included a 13-foot-long solo whitewater canoe, a 16-foot-long tandem canoe, a 17-foot-long tandem canoe, and a 19-foot-long tandem canoe).

[165] Docket 52-6 at 12.

[166] Docket 52-13 at 24, 28.

[167] Docket 52-17 at 4.

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 37 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 37 of 39

Docket 55 is GRANTED in part and DENIED in part, insofar as the Court finds that mere depth of water alone is insufficient to establish navigability as a matter of law; the motion is otherwise denied. At trial, the Court intends to apply the plain language of *The Daniel Ball*. As noted above, the Court

- defines "customary" as "commonly used" in the state of Alaska, with uses in other areas of the state outside of the Fortymile Region going to the weight to be accorded to such evidence;

- will consider evidence proffered to show that a watercraft was customary based on its use for trade or travel, and such evidence is not limited to commercial uses;

- will consider evidence of watercraft use in Alaska prior to or at the time of statehood to determine what vessels were customary at statehood; and

- finds that susceptibility to use requires a showing that Disputed North Fork could have been used as a highway for commerce by a customary mode of trade or travel at statehood.

Further, the State's Motion for Summary Judgment at Docket 51 is DENIED. The Court finds that disputes of material fact remain as to:

- Whether handmade wooden boats or jetboats were customary modes of trade and travel at statehood;

    o If so, whether Disputed North Fork was susceptible to use as a

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 38 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 38 of 39

highway for commerce by either of these watercraft, including whether either of these watercraft is meaningfully similar to present-day watercraft.

- Whether Disputed North Fork was susceptible to use as a highway for commerce by poling boats, canoes, inflatable rafts, motorized boats with or without lifts, or airboats, including whether any of these watercraft are meaningfully similar to present-day watercraft.

The Court sets a telephonic status conference for **March 11, 2024, at 9:30 a.m.** to schedule a trial date. All parties shall participate telephonically by dialing 571-353-2301 (Call ID 020262828, Pin 487051) approximately five minutes before the scheduled hearing time. The parties are instructed to meet and confer beforehand to discuss potential dates for and length of trial.

DATED this 27th day of February, 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:18-cv-00265-SLG, *State of Alaska v. United States of America*
Order re Motion and Cross-Motion for Summary Judgment
Page 39 of 39

Case 3:18-cv-00265-SLG   Document 68   Filed 02/27/24   Page 39 of 39